WALTER LACY AND ALOIS LACY,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 93334.   Filed March 29, 1963.

---

[1] This case and those of Harold W. and Mary E. Cuckler, Royden and Doris Brown, Docket Nos. 87982 and 93268, and Trinidad National Bank, Docket No. 93182, were tried together under an agreement of all counsel that all testimony and evidence introduced at the trial except separate written signed stipulations filed in each case, would apply to and be part of the record in each case. All counsel were permitted to question all witnesses.

*Thomas K. Hudson, Esq.*, for the petitioners.
*Jack Morton, Esq.*, for the respondent.

### OPINION.

MURDOCK, *Judge:* The only question for decision is whether Lacy bought the bank building from Cuckler, Brown & Co. for $100,000 or whether he bought it indirectly from the bank for $33,000. He agrees that the property was worth $133,000 and does not argue that the bank had less than $100,000 of earned surplus and undivided profits. Furthermore, each of those facts is inherent in the Commissioner's determination, is presumed to be correct, and has not been disproven. The Commissioner concedes that he has taken inconsistent positions in taxing this dividend to Lacy and to Cuckler and Brown.

The petitioner does not dispute that a purchase by a stockholder from the corporation at a bargain price would result in a dividend to the stockholder to the extent of the excess of the fair market value of the property over the amount paid for it. He contends that Cuckler, Brown & Co., not he, purchased the bank building and owned the stock at that time and he paid its full value, $133,000, to acquire that property.

Counsel for Lacy raise two points in their reply brief not raised in the Cuckler and Brown cases. One is that the ban on parol evidence to vary the terms of a written instrument apply and the other, never previously raised, is that the Commissioner is barred from introducing any evidence inconsistent with the written stipulation filed in this

case. The stipulation provides "that either party may introduce other and further evidence not inconsistent with the facts and exhibits herein stipulated." Lacy counsel claim that Cuckler's parol evidence is inconsistent with exhibit 3, the contract of July 16, 1955. The stipulation is that that agreement was entered into and the deeds were executed.

It is proper in tax cases to look through form to substance, if that is necessary, in order to determine the correct tax consequences of the acts of each taxpayer and those dealing with him in the transactions giving rise to the taxes. *Sarah Helen Harrison*, 17 T.C. 1350. Cf. *Helvering* v. *Lazarus & Co.*, 308 U.S. 252. The tax effect of a whole transaction should not be hidden by niceties of title or conveyancing. Cf. *Gregory* v. *Helvering*, 293 U.S. 465; *Griffith* v. *Commissioner*, 308 U.S. 355, 357; *Rupe Investment Corporation* v. *Commissioner*, 266 F. 2d 624, affirming 30 T.C. 240; *Estate of Arthur L. Hobson*, 17 T.C. 854. Also it is important in these cases that the Cuckler and Brown cases, on the one hand, and this Lacy case, should be decided upon the same facts, since they both arise from the same transactions. This cannot be done unless Cuckler's testimony is used in each. All counsel agreed with the Court, at the start of the single trial, that all evidence received during that trial would apply in all of the cases. The Commissioner called both Cuckler and Lacy and all counsel had the opportunity to cross-examine each.

The parol evidence rule to which the Lacy counsel refer applies between the parties or privies to a written agreement, but a different situation is presented here. Each separate proceeding here is between a taxpayer on the one side and the Commissioner of Internal Revenue on the other. The Commissioner was not a party to the agreement of July 16, 1955, and Lacy cannot invoke the parol evidence rule against him. *Stern* v. *Commissioner*, 137 F. 2d 43, affirming a B.T.A. Memorandum Opinion; *Tex Penn Oil Co.* v. *Commissioner*, 83 F. 2d 518, affd. 300 U.S. 481; *Scofield* v. *Greer*, 185 F. 2d 551; *United States* v. *Board*, 14 F. 2d 459; *Sarah Helen Harrison, supra.* Cf. *Estate of Leon Holtz*, 38 T.C. 37, 41. This is particularly true where the parol evidence relates to the consideration. *Haverty Realty & Investment Co.*, 3 T.C. 161, 167, and cases there cited.

Furthermore, that rule does not apply where there is ambiguity in the written instrument. *Allen* v. *Werner*, 190 F. 2d 840; *Paramount Pest Control Service* v. *United States*, 304 F. 2d 115; *Jones* v. *United States*, 96 F. Supp. 973, affd. 194 F. 2d 783; *Estate of Leon Holtz, supra.* The first statement in the agreement of July 16, 1955, is that "Buyers agree to buy from Seller One Thousand Shares of the Present One Thousand Shares of Capital Stock of the Trinidad National Bank, Trinidad, Colorado, for the gross Sum of Four Hundred Seventy-Five Thousand Dollars ($475,000.00)" and that portion of the sen-

tence would indicate that the only subject of the sale was the 1,000 shares of bank stock and the purchase price of that stock was $475,-000. The remaining portion of the sentence, quoted in part above, may be consistent with the first part or may introduce ambiguity, for it is that the $475,000 is "to be the total amount received by the Sellers for the Banking Corporation Stock and the Banking Building, other than the interest on the Bank Building Loan." The "Sellers" did not own or hold title to "the Banking Building" and were in no position on July 16, 1955, to sell it. The 1,000 shares being all of the outstanding stock of the bank would give the buyer control over and indirect ownership of, all assets of the bank, including the "Bank Building." The entire sentence, standing alone, could be an effort to make sure that the bank building remained a part of the bank assets and thus ownership of all of the bank stock would give the buyer all that he wanted for his $475,000. But what did it mean when read with the next provisions?

The reference to "the Bank Building Loan" is not clarified in any way in the written agreement. The doubts arising from the first sentence, discussed above, are intensified by the next four numbered paragraphs according to which the sellers are first to buy the "Bank Building" from what had been their wholly owned corporation, with "the Buyer," who wants to hold "the bank undivided profits the same as it were before the transaction," paying the $33,000 "purchase price" to the bank. Why the buyer, who was borrowing $475,000, would want to part with an additional $33,000 for that purpose (which would in no way benefit the sellers and which Lacy says is inconsistent with the stated price of $475,000) is not clear. Next the buyer is to buy the bank building from the sellers for $100,000 and the agreement spells out a method of payment which both buyer and sellers agree was never carried out. If Lacy could have raised and paid $475,000 for the stock without pledging the bank building he could have avoided the $33,000 payment, the title transfers of the bank building, the $146.30 cost of documentary stamps, and all of the deficiencies in these cases based on the transfers of the bank building. The court concludes that the agreement of July 16, 1955, is sufficiently ambiguous to permit parol evidence to explain just what the parties intended and what the $475,000 was paid for.

Lacy's counsel stated, when Lacy was on the stand, that "so far as Mr. Lacy is concerned he doesn't care to give the Court an explanation of the contract before the Court" (Ex. 3). Nevertheless, Lacy testified that Cuckler raised the purchase price from $475,000 to $508,000 by demanding the $33,000 payment to the bank. This testimony of Lacy is inconsistent with the July 16 contract but it is clear that Cuckler and Brown never received more than the $475,000, which that contract provided. Lacy certainly did not intend to have Cuckler and

Brown benefit from his $33,000 payment to the bank. There is no explanation in the contract of why Lacy would pay $33,000 to the bank or why he would have the two deeds transferring title first to Cuckler, Brown & Co. and 2 days later transferring title to him, except to enable him to use that real estate to obtain a loan of the $100,-000 which he needed to make up the $475,000 purchase price. Cuckler's testimony explains the purpose of the written contract and the above-mentioned provisions, is reasonable and persuasive, and is needed to decide these cases properly. The belated objection in his reply brief on the basis of the stipulation has little to recommend it and there is better reason to reject it.

Cuckler gave the Court an explanation which seems reasonable and is persuasive. It appears from his testimony and from other evidence applicable to all cases that Lacy (perhaps with the assistance of his mother) had arranged with an Oklahoma bank for a loan of $375,000, with the bank stock to be pledged as security; he needed an additional $100,000 to complete the purchase of the stock; and all references to the "Bank Building" were placed in the agreement at Lacy's request solely to give him time and means to complete arrangements with a Denver bank for a loan of $100,000 on which he would pledge the "Bank Building" as security. Lacy paid $33,000 into the Trinidad Bank to keep its book assets unchanged in amount so that the lender of the $375,000 might not complain. Cuckler, Brown & Co. held title to the bank building for 2 days as security for the balance owed them and only until Lacy completed arrangements to borrow the balance he owed Cuckler and Brown. It is reasonably clear that Cuckler and Brown did not want to own the bank building and that Lacy had no intention to permit them to own it. The complicated provisions in the July 16, 1955, agreement, all placed there at Lacy's insistence and for his benefit, should not conceal the fact that what Cuckler and Brown sold for $475,000 was their bank stock. Cuckler and Brown started off with 1,000 shares of bank stock which they desired to sell for $475,000, they parted with that stock and nothing more, and they received $475,000 and nothing more.

All acts performed by the bank "stockholders," officers, and directors, after Lacy acquired beneficial ownership and control of all of the bank stock on July 16, 1955, in carrying out the terms of the agreement of July 16, 1955, with respect to the bank building, are chargeable to Lacy who then alone was in position to require those acts to be performed. *Frithiof T. Christensen*, 33 T.C. 500, and cases there cited. Cuckler and Brown were not the beneficial owners of the stock on July 18, 1955, when title to the bank building was transferred to them and had no right to bind the corporation except to carry out Lacy's directions.

The Commissioner determined that Lacy received a taxable dividend of $100,000 from the bank through its bargain purchase of the bank building while he was a stockholder of the bank, indeed the sole stockholder. Sec. 301, 1954 Code. Cf. *Lester E. Dellinger*, 32 T.C. 1178. The bargain was that he paid the bank only $33,000 and acquired a property having a fair market value of $133,000. Lacy became the equitable owner of the stock when he made the cash payment of $375,000 on July 16 and, although he took an indirect route to acquire title to the real estate, he paid the purchase price on July 16, 1955, and acquired title to the real estate on July 20, 1955. The intervening steps can be attributed to no one but Lacy. The evidence does not show that the Commissioner erred in any respect in making his determination.

*Decision will be entered for the respondent.*