DUDLEY G. SEAY AND SYBIL R. SEAY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2906–70.    Filed April 10, 1972.

*John M. Byers* and *Gerald J. Kahn,* for the petitioners.
*Denis J. Conlon* and *Robert F. Brunn,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $26,066.60 in the petitioners' 1966 Federal income tax. The only issue for decision is whether $45,000 of a $105,000 payment, which one of the petitioners received in settlement of claims against his former employer, is excludable from gross income as damages received on account of personal injuries.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Dudley G. Seay and Sybil R. Seay, are husband and wife and maintained their residence in Minneapolis, Minn., at the

time their petition was filed in this case. They filed their 1966 joint Federal income tax return with the district director of internal revenue, Milwaukee, Wis. Mr. Seay sometimes will be referred to as the petitioner.

From 1960 until the beginning of 1965, the petitioner was president of the Basic Products Corp. (Basic). In 1965, the petitioner undertook to acquire the financial backing necessary to purchase two divisions of that corporation. Mr. Dwayne Andreas, representing the Farmers Union Grain Terminal Association (GTA), learned of Mr. Seay's efforts to acquire such financing and contacted him. As a result of negotiations between Mr. Seay and Mr. Andreas, an agreement was reached under which GTA purchased the assets of the two divisions. The assets of one of these divisions were then leased by GTA to a corporation called the Froedtert Malt Corp. (Froedtert). This corporation was to be operated by the petitioner as president, Robert R. Ollman as vice president and treasurer, and Gordon D. Foster as executive vice president. According to oral employment contracts, their respective salaries were to be $60,000 per year, $30,000 per year, and $25,000 per year, and they were to share in the profits of the enterprise. The employment contracts were each for a period of 5 years and were renewable for a like period of time. In order to become president of this new corporation, Mr. Seay resigned his former position as president of Basic. The newspaper publicity regarding his resignation did not indicate that he had been given the opportunity to purchase two divisions of Basic and was somewhat embarrassing to him.

In 1966, a dispute arose between Mr. Seay, Mr. Ollman, and Mr. Foster (the Seay group) and the management of GTA. On May 25, 1966, the board of directors of Froedtert dismissed the petitioner, Mr. Ollman, and Mr. Foster and terminated their employment. The specific reason given for the petitioner's dismissal was that the corporate bylaws required the president to be a director and he was not a director. Each member of the Seay group was notified of the board's termination of his employment by a letter of May 27, 1966, and was therein informed that Mr. Thomas R. Gettelman would arrive on June 1, 1966, to assume control of the operations of Froedtert. Each letter concluded by stating that Mr. Max Kampelman had been retained to resolve the question of the management fee due to the Seay group. Acting on the advice of counsel, the Seay group refused to vacate the premises when Mr. Gettelman arrived.

On June 7, 1966, Froedtert filed a complaint in the Circuit Court of Milwaukee County, Wis., which recited the events of May 25, 1966, to June 1, 1966, alleged that the refusal of the Seay group to vacate the

premises constituted trespass, and sought an order permanently restraining the members of the Seay group from occupying the premises, managing Froedtert, or causing that corporation to pay them any compensation for the period after June 1, 1966.

The filing of the complaint received publicity in the Milwaukee Journal, Milwaukee Sentinel, and The Wall Street Journal. Each article repeated the basic recitations and allegations of the complaint and referred to the petitioner's having been replaced as president of Basic in 1965. The petitioner believed that the publicity was a source of personal embarrassment and damaging to his personal reputation but, on the advice of counsel, he did not reply to the publicity. However, counsel was instructed to file a counterclaim for damages arising both from the adverse publicity and from the alleged breach of the oral employment contracts. The counterclaim was never prepared, as a settlement was signed on June 24, 1966. Previous to the settlement, the corporation had obtained a restraining order and a show cause order, and the Seay group had vacated the premises. After the suit was settled, the petitioner released a statement to the press claiming that the entire dispute had arisen over the question of how to operate Froedtert.

The negotiations leading to the settlement were mainly conducted by Mr. Orin Purintun, as counsel for the Seay group, and Mr. Max Kampelman, for both GTA and Froedtert. GTA was involved as it owned the assets of Froedtert and as the oral employment contracts were originally negotiated with it. Mr. M. W. Thatcher, the chief executive officer of GTA, and his assistant, Mr. Malusky, were given the authority by the board of directors of GTA to take the steps necessary to effect a settlement. In turn, Mr. Thatcher authorized Mr. Kampelman to settle the dispute. The only limitations that Mr. Thatcher placed on Mr. Kampelman's authority were that the settlement should not exceed $300,000 in cash plus 5 percent of the profits. The claims of the Seay group that there had been a breach of contract and that they had been damaged by the publicity were a part of the settlement negotiations between Mr. Purintun and Mr. Kampelman.

On June 23, 1966, a lump-sum settlement of $250,000 was accepted by Mr. Purintun on the understanding that it consisted of 1 year's salary for each member of the group, or $115,000, plus $45,000 for each member as damages caused by the newspaper publicity. On June 24, 1966, a settlement agreement was signed by the members of the Seay group, the new president of Froedtert, and a representative of GTA. The agreement stated that the sum of $250,000 had been paid to the Seay group, but did not allocate that sum in any way. On that same day, the suit by Froedtert was dismissed by mutual stipulation. On

June 27, 1966, the proceeds of the settlement were distributed as follows:

| | |
|---|---|
| Legal fees | $25, 272. 86 |
| Out-of-pocket expenses (Dudley G. Seay) | 560. 00 |
| Dudley G. Seay: | |
| Salary equivalent | 60, 000. 00 |
| Additional | 36, 389. 04 |
| Robert R. Ollman: | |
| Salary equivalent | 30, 000. 00 |
| Additional | 36, 389. 05 |
| Gordon D. Foster: | |
| Salary equivalent | 25, 000. 00 |
| Additional | 36, 389. 05 |
| Total | 250, 000. 00 |

On June 28, 1966, Mr. Purintun prepared and sent to Mr. Kampelman a letter which was directed to Mr. Purintun, to be signed by Mr. Kampelman, confirming that they had agreed on the following allocation of the $250,000 payment:

| | Salary equivalent | Additional | Total |
|---|---|---|---|
| Mr. Seay | $60, 000 | $45, 000 | $105, 000 |
| Mr. Ollman | 30, 000 | 45, 000 | 75, 000 |
| Mr. Foster | 25, 000 | 45, 000 | 70, 000 |

The letter stated that the additional sums were "as compensation for such personal embarrassment, mental and physical strain and injury to health and personal reputation in the community" as the members of the Seay group had suffered. Mr. Kampelman signed the letter on July 1, 1966, because he thought it reflected the understanding he had with Mr. Purintun.

On November 6, 1969, Mr. Malusky, who had become the chief officer of GTA, signed a letter which he authorized the petitioner to show to the Internal Revenue Service and which had been prepared by the general counsel of GTA. The letter stated that the allocation of the settlement payment was correctly stated in the letter which Mr. Kampelman had signed on July 1, 1966.

The petitioner, on his 1966 joint Federal income tax return, reported the $60,000 salary equivalent less $8,610.96 in legal fees as ordinary income. In his notice of deficiency, the respondent increased the petitioner's income by the $45,000 "additional" payment and a $1,255.01 item not contested in this case.

### OPINION

The issue for decision is whether $45,000 of a $105,000 payment which the petitioner received in settlement of claims against his

former employer is excludable from gross income as damages received on account of personal injuries.

The petitioner contends that he made a bona fide claim for personal injuries; that his claim was part of the settlement negotiations; and that it was satisfied by the payment of $45,000. The petitioner, thereby, concludes that the $45,000 payment was made on account of personal injuries and is exempt from taxation under section 104(a)(2), I.R.C. 1954.[1]

The respondent contends that the petitioner has failed to prove that he suffered any personal injuries for which he could recover damages in the courts, and therefore, section 104(a)(2) is inapplicable. In the alternative, the respondent contends that even if the petitioner has suffered such injuries, the $45,000 payment was not in settlement of a claim for such injuries. Finally, the respondent contends that even if a portion of the $45,000 payment was in satisfaction of a claim for personal injuries within the meaning of section 104(a)(2), part of such payment was for other purposes, and because the petitioner has failed to show what portion of the payment was made for such personal injuries, no part of the payment is excludable under section 104(a)(2). Only the taxability of $45,000 of the total $105,000 payment made to the petitioner is in question, as the petitioner reported $60,000 of the payment as ordinary income.

As the parties are in disagreement concerning not only what the petitioner has proved, but also what he is required to prove, we must first discuss the burden of proof which the petitioner has in this case. The petitioner's position is not that he does not have the burden of proof, but, rather, that the burden of proof does not require him to show that he had a valid claim for damages.

Section 104(a)(2) provides that damages received in a settlement agreement "on account of personal injuries" are not includable in gross income. However, neither the Code nor the regulations explain what a taxpayer must show in order to prove that he has received damages "on account of personal injuries." The petitioner urges us to apply a standard like that used in *Tygart Valley Glass Co.*, 16 T.C. 941 (1951). In that case, the petitioners contended that the amounts received in a settlement were made in payment of a fraud claim and taxable at capital gain rates, and the respondent claimed that the amounts received were in payment of a royalties' claim and taxable at ordinary income rates. Although both parties presented evidence on the validity of each claim, the Court declined to decide whether the claims were valid and simply stated at page 949 that:

we consider it unnecessary to decide upon such validity, * * * for our question is not * * * [the] validity, but the nature, for tax purposes, of an amount received

---

[1] All statutory references are to the Internal Revenue Code of 1954.

in settlement, which rests not upon the validity but upon the nature of the matter settled. * * *

Although *Tygart Valley Glass Co.* and similar cases do not involve section 104(a)(2), they do involve the question of what the petitioner is required to prove to establish the nature of the payments received in settlement of a claim. See, e.g., *Spangler* v. *Commissioner*, 323 F. 2d 913, 916 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; *Carter's Estate* v. *Commissioner*, 298 F. 2d 192, 194 (C.A. 8, 1962), affirming 35 T.C. 326 (1960), certiorari denied 370 U.S. 910 (1962); *Sanders* v. *Commissioner*, 225 F. 2d 629, 635 (C.A. 10, 1955); *Morse* v. *United States*, 371 F. 2d 474, 482–483 (Ct. Cl. 1967); *Chalmers Cullins*, 24 T.C. 322, 327 (1955). See also *United States* v. *Safety Car Heating Co.*, 297 U.S. 88, 98 (1936); *Anchor Coupling Co.* v. *United States*, 427 F. 2d 429, 433 (C.A. 7, 1970). As such, these cases are in general agreement in holding that the petitioner does not have to prove the validity of his claim; rather, he must show the nature of the claim which was the actual basis for the settlement.

Since there is nothing in either section 104, the regulations thereunder, or the legislative history of the section to indicate that Congress intended to make the petitioner's burden of proof in a section 104 settlement case any greater than that which he has in other settlement cases, we hold that the determination of whether a settlement payment is exempt from taxation depends on the nature of the claim settled and not on the validity of the claim. This holding is also supported by the general approach of two circuit Courts of Appeals in dealing with the question of a settlement and the applicability of section 104 (a)(2). In both cases, the court did not evaluate the validity of the claim, but attempted to determine the actual reason for the making of the settlement payment. *Knuckles* v. *Commissioner*, 349 F. 2d 610, 613 (C.A. 10, 1965), affirming a Memorandum Opinion of this Court; *Agar* v. *Commissioner*, 290 F. 2d 283, 284 (C.A. 2, 1961), affirming per curiam a Memorandum Opinion of this Court.

Having decided that the taxability of the settlement payment depends upon the nature of the claim settled, we now reach the question of whether the petitioner has shown that such claim was a claim for personal injuries. This determination is a factual one (see *Knuckles* v. *Commissioner, supra*), and, based on an examination of all the evidence, we find that the $45,000 payment was received "on account of personal injuries" within the meaning of section 104(a)(2).

Mr. Seay believed that the publicity concerning his dismissal from employment was a source of personal embarrassment and damaging to his personal reputation, and we have no reason to doubt the bona fides of this belief. Compare *Knuckles* v. *Commissioner, supra*. Mr. Purintun, who represented the petitioner in the settlement negotia-

tions, stated that he believed the publicity resulted in personal injury to the petitioner, and Mr. Kampelman, who represented GTA, knew of the petitioner's claim for damages on account of personal embarrassment and harm to personal reputation. Both negotiators testified that this claim was a part of the settlement negotiations and that the acceptance of the agreement by Mr. Purintun was conditioned on an allocation of part of the settlement proceeds being made to such claim. Finally, both Mr. Purintun and Mr. Kampelman testified that the letter of July 1, 1966, which was prepared by Mr. Purintun and signed by Mr. Kampelman, accurately reflected the allocation of the payment. This letter clearly designated the $45,000 payment "as compensation for such personal embarrassment, mental and physical strain and injury to health and personal reputation in the community" as the petitioner had suffered. Three years later, the general manager of GTA signed a letter stating that the nature of the $45,000 was correctly designated in the 1966 letter by Mr. Kampelman. Moreover, even though each member of the Seay group received a different salary, the letter indicated that each received the same amount for personal embarrassment and injury to his personal reputation. Under these circumstances, where the chief negotiator for each party has testified that the payment was for personal injuries and where there is a letter which has been acquiesced in by the parties and which states that the payment was for personal injuries, the petitioner has successfully established that the nature of the claim was for personal injuries and that the payment was for settlement of such claim. See *Knuckles* v. *Commissioner*, *supra; Agar* v. *Commissioner*, *supra*.

In view of that conclusion, this case is distinguishable from *Knuckles* and *Agar*, which were cited by the respondent. In *Agar*, it was found that although the petitioner may have made a claim for personal injuries, the company did not make any payment in settlement of that claim. In *Knuckles*, the court found that the tort claim was not part of the settlement negotiations, but, rather, an afterthought based on the tax consequences of the claim.

In addition to questioning the bona fide nature of the petitioner's claim, the respondent also argued that GTA did not agree that the $45,000 was to be in settlement of a claim for personal injuries, and that the letter signed by Mr. Kampelman is inadmissible because of the parol evidence rule.

The contention that GTA did not agree that the $45,000 was in settlement of a personal injury claim is based on the allegation that Mr. Kampelman did not have the authority to make such an allocation. This lack of authority is said to exist because Mr. Kampelman was allegedly only a mediator for GTA, because neither Mr. Kampel-

man nor Mr. Thatcher could recall discussing the allocation when Mr. Thatcher approved the settlement, and because it is not clear that the board of directors of GTA was aware of the allocation. Yet, after initially being informed that he was only a mediator, Mr. Kampelman was told by Mr. Thatcher, who had been authorized by the board of directors of GTA to take steps necessary to effect a settlement, to make a settlement. At that time, Mr. Kampelman became the agent of GTA in settling the claim, and an agent's agreements are generally binding on his principal where they are within either the actual or apparent scope of his authority. Seavey, Agency, sec. 75 (1964) ; see *Grummitt* v. *Sturgeon Bay Winter Sports Club*, 197 F. Supp. 455, 458–459 (E.D. Wis. 1961). The only limit on Mr. Kampelman's authority was as to the amount that would be paid by GTA, and this limit was apparently not communicated to Mr. Purintun. Because we believe that the allocation of damages is not so unusual a part of settlement negotiations as to be beyond both the apparent and actual scope of Mr. Kampelman's authority, we find that such allocation is binding on GTA. Furthermore, in 1969, the general counsel, Mr. Clark, prepared a letter, which Mr. Malusky signed, stating that GTA had indeed agreed to pay the petitioner $45,000 on account of a claim for personal injuries. Mr. Malusky testified that he recalled Mr. Thatcher discussing the allocation; and Mr. Kampelman testified that, although he was not sure, he did believe that the allocation had been discussed between him and Mr. Thatcher. Even Mr. Thatcher, who like Mr. Clark and Mr. Malusky, was a witness for the respondent, testified that he would have approved the allocation if it had been presented to him, but that he simply did not recall discussing it. For these reasons, we have rejected the respondent's argument that the allocation was not approved by GTA.

We also reject the respondent's contention that the letter signed by Mr. Kampelman which designated the $45,000 payment as being in settlement of a claim for personal injuries is inadmissible under the parol evidence rule. This Court has generally held that the parol evidence rule is not applicable in proceedings between a taxpayer and the Commissioner, since the Commissioner was not a party to the written agreement. See, e.g., *J. Leonard Schmitz*, 51 T.C. 306 (1968), on appeal (C.A. 9, May 2, 1969) ; *Walter Lacy*, 39 T.C. 1100 (1963), affd. 341 F. 2d 54 (C.A. 10, 1965). Even if the rule were applied in these proceedings, it would not be applicable to the letter, because it tends to explain the settlement agreement, and not to contradict it. 2 Jones, Evidence, sec. 466, p. 888 (5th ed. 1958). The letter not only designated the amount paid on account of the claim for personal injuries, but it also explained how the total payment was to be allocated

among the members of the Seay group. It does not contradict the agreement, as the agreement made no allocation of the payment. Finally, the letter was not a device thought of after the settlement to enable the petitioner to attain tax advantages; rather, it was to confirm in writing that, as an important part of the settlement negotiations, Mr. Kampelman and Mr. Purintun had agreed to the allocation set forth therein.

The respondent's final ground for taxing the entire payment received by the petitioner is based on his argument that part of the payment was for the petitioner's embarrassment, that damages for embarrassment are not excludable under section 104(a)(2), and that since there is no allocation of the payment between the amount paid for embarrassment and the amounts paid for other purposes, the entire payment is taxable. Mr. Kampelman's letter stated that the payment was to settle a claim for "compensation for * * * personal embarrassment, mental and physical strain and injury to health and personal reputation in the community." The regulations under section 104(a)(2) provide that:

The term "damages received (whether by suit or agreement)" means an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution. [Sec. 1.104–1(c), Income Tax Regs.]

Similarly, both this Court and the respondent have long recognized that amounts received in settlement of claims arising out of the alienation of affection or defamation of character are exempt from taxation. See *C. A. Hawkins*, 6 B.T.A. 1023 (1927), acq. VII–1 C.B. 14 (1928), cited in Rev. Rul. 58–418, 1958–2 C.B. 18, 19; Sol. Op. 132, I–1 C.B. 92 (1922). This Court has also held that damages received in a breach-of-contract-to-marry suit were exempt from taxation, even though the jury in the tort case was instructed to consider the "distress of mind" suffered by the petitioner in computing the damages. *Mrs. Lyde McDonald*, 9 B.T.A. 1340 (1928). Thus, the respondent does not contend that any of the personal injuries in the present case, other than embarrassment, are not included within the scope of section 104(a)(2). Under these circumstances, we believe that the "personal embarrassment" was incidental to or in aggravation of section 104(a) (2) personal injuries and that the entire $45,000 payment is, therefore, excludable under section 104(a)(2). In reaching this conclusion, we have found it unnecessary to decide whether damages received in settlement of a claim based solely upon personal embarrassment would be excludable under section 104(a)(2).

Because of another uncontested adjustment,

*Decision will be entered under Rule 50.*