T.C. Memo. 1997-330


UNITED STATES TAX COURT


GEORGE AND KATHLEEN KNEVELBAARD, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 21366-94, 21981-94,   Filed July 21, 1997.
    22527-94, 22528-94,
    22529-94, 22530-94,
    22531-94.


  George and Kathleen Knevelbaard, pro sese.

  <u>Danny D. Brace, Jr</u>., for petitioners in docket No. 21981-94.

  <u>Ronald W. Hillberg</u>, for petitioners in docket Nos. 22527-94,
22528-94, 22529-94, 22530-94, and 22531-94.

---

  [1]  Cases of the following petitioners are consolidated
herewith: Wilbur E. Gomes and Irene R. Gomes, docket No. 21981-
94; Sam S. Kooistra and Cynthia L. Kooistra, docket No. 22527-94;
Walter H. Brown and Helen Joan Brown, docket No. 22528-94; Arnold
Leroy Souza and Rosemary Souza, docket No. 22529-94; Vernon C.
Christian and June C. Christian, docket No. 22530-94; and Phillip
A. Souza and Llyn Souza, docket No. 22531-94.

Kelly Mulholland and Andrew Gottlieb, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  Respondent determined the following deficiencies in petitioners' Federal income tax for the 1990 tax year:

| Docket No. | Petitioners | Deficiency |
|---|---|---|
| 21366-94 | George and Kathleen Knevelbaard | $6,592 |
| 21981-94 | Wilbur E. and Irene R. Gomes | 23,294 |
| 22527-94 | Sam S. and Cynthia L. Kooistra | 1,404 |
| 22528-94 | Walter H. and Helen Joan Brown | 2,393 |
| 22529-94 | Arnold Leroy and Rosemary Souza | 2,646 |
| 22530-94 | Vernon C. and June C. Christian | 1,680 |
| 22531-94 | Phillip A. and Llyn Souza | 5,349 |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

The issue is whether payments received by petitioner dairy farmers from various Bank Defendants in settlement of a lawsuit are excludable from gross income as compensation for personal injuries under section 104(a)(2).  We hold they are.

## FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts and attached exhibits are incorporated herein by this reference.  When their petitions were filed, all petitioners resided in California.

Petitioners are dairy farmers (milk producers) who sold raw milk to Knudsen Dairy (Knudsen), a large independent processor and distributor of dairy products in California. The Knevelbaards are members of the South Valley Milk Producers Cooperative, and the Christians are members of the Cal-Dari Cooperative. Petitioners Gomes, Kooistra, and Brown are independent producers. The Souzas are partners in P&L Souza Dairy.

In early 1985 Knudsen purchased Foremost Dairies (Foremost). Citicorp Industrial Credit, Inc. (Citicorp), along with Security Pacific Business Credit, Inc., Wells Fargo Business Credit, Inc., Goldome Bank, and National Bank of Canada, provided the financing for Knudsen's purchase of Foremost (collectively, Bank Defendants). As part of the financing agreement for Knudsen's purchase of Foremost, the Bank Defendants also refinanced Knudsen's existing debt.

Knudsen entered into long-term agreements with dairy farm cooperatives and independent producers, including petitioners, for the purchase of raw milk. The contracts required Knudsen to buy all milk produced by the milk producers. Knudsen was

required to pay for the raw milk twice per month;[2] the dairies were required to ship milk to Knudsen on a daily basis.

On July 14 and again on July 31, 1986, Knudsen failed to pay the milk producers about $30 million for raw milk delivered to Knudsen between June 16 and July 15, 1986. On July 15, Knudsen began to make daily payments for milk delivered the previous day. However, no payments were made on the $30 million back debt.

When Knudsen defaulted, petitioners could not simply stop producing milk. Cows had to be milked and fed. Farmhands had to be paid. Grain had to be purchased. The farmers were operating on very slim profit margins. They faced the possibility of slaughtering their herds or pouring the milk onto the ground. For years (in some cases for more than one generation) they had relied on the regularity of the milk payments. Unexpectedly, they were faced with borrowing money, depleting their savings, and possible bankruptcy.

The uncertainty of their situation produced enormous stress, which did not end on July 15, 1986. The financial problems caused by losing payment for 4 weeks' worth of milk persisted, because the loss was not repaid. Even when Knudsen began making daily payments, there was no guarantee that the money would be

---

[2] According to the stipulation, the contract required payment on the 13th and 28th days of each month. However, petitioners testified that they received payment on the 15th and either the last day of the month or 1st day of the succeeding month. The discrepancy is not material.

there from one day to the next.  Petitioners had to rearrange their lives so they could be personally present when the milk was picked up, in order to see the money before they released the milk.  The situation did not stabilize for months.

The personal experiences of three of petitioners illustrate the effects of these events.

Phillip A. Souza (Souza) was in partnership with his brother, petitioner Arnold Leroy Souza.  Souza has been a dairy farmer for 30 years.  At the time of the default, he owned about 450 cows which had to be milked every day.  Unlike many of the milk producers, Souza was able to find another dairy to buy his milk within 2 days of Knudsen's default.  Even so, he lost about $76,000, which forced him to borrow money from his father and a bank.[3]  He suffered a stress-related heart attack in 1988 (for which he takes 11 pills daily).

George Knevelbaard (Knevelbaard) was born into the dairy industry and believed, based on past experience, that "There would always be work, there would always be bills, and on the first and the 15th there was always a check in the mailbox.  This was as certain as the sun rising and setting."  His expenses were about 90 percent of his revenue.  He was shocked to discover that the system on which he and his family had always depended was in jeopardy.  Suddenly, and continuing for months, he could not

---

[3]    As of Dec. 14, 1995, the money had not all been repaid.

predict from one day to the next whether a truck would come to pick up the milk or, if it did, whether he would be paid.

At the time of the default by Knudsen, Wilbur Gomes (Gomes) had been in the dairy business 29 years. He grew up on a dairy farm and began his own operation in 1957 with 29 cows. By 1986, he had 800 cows and 800 calves. Each cow had to be milked twice a day. The "morning milking" began at 10 p.m. the prior evening and ended at 6 a.m. The evening milking went from 10 a.m. to 6 p.m. This had to be done 365 days a year. Gomes' operation required nine full-time farmhands working 7 days per week.

Gomes began selling his milk to Borden Dairy in 1957 and continued with Knudsen when it acquired Borden in 1978. For 29 years the milk money always came, twice a month. His costs for feed and overhead were about 95 percent of his revenue. Expense payments were geared to the milk payments. For instance, his employees were paid twice a month, on the 1st and 15th. Gomes paid his grain dealer with the milk check that came the 15th of each month. His grain bill ran between $30,000 and $40,000 per month. When the first milk check did not arrive, Gomes used up all of his life savings to pay the grain bill. Gomes' major fear was that, because of the $4,000 daily overhead which he could no longer pay, he would have to start slaughtering his herd of purebreds, built up over 30 years. He received an appraisal that

the slaughter price as meat would be only 20 percent of the herd's value as dairy cows.

Gomes frantically looked for another place to sell his milk, going to daily meetings of dairymen's associations and cooperatives, but all to no avail, because everyone was in the same boat. In September 1986, after Knudsen sold its plant in Hughson, California, Gomes began shipping his milk to the new owners there.

Despite their stress, petitioners did not seek professional mental health assistance. Their reasons were varied. Some were cultural. Gomes was brought up in a small Portuguese community of about 2,000 people. He had been taught that an emotional problem was a sign of personal inadequacy, and to seek professional help was a thing to be shunned. Knevelbaard's reasons for not seeking professional help were religious. In times of stress he seeks consolation and encouragement through prayer and Bible reading.

Within 2 months after Knudsen defaulted on payments to the milk producers it filed a chapter 11 petition in the U.S. Bankruptcy Court for the Central District of California. The milk producers were unsecured creditors. All filed proofs of claim.

On January 12, 1989, petitioners were among nearly 1,000 milk producers, individually or through their cooperatives, who

also filed a complaint against the Bank Defendants, in the action entitled In re Milk Producers v. Citicorp Industrial Credit, Inc. (milk producers action) in the Superior Court of the State of California, Los Angeles County. By stipulation re amendment of exhibit A to the complaint, filed July 2, 1990, all petitioners herein were named as plaintiffs in their individual capacities; the entities with which they were affiliated were also named. The complaint alleged 12 causes of action sounding in tort based upon the Bank Defendants' direct liability: (1) Fraud/misrepresentation, (2) negligent misrepresentation, (3) intentional interference with contractual relationship, (4) negligent interference with contractual relationship, (5) intentional interference with prospective economic advantage, (6) negligent interference with prospective economic advantage, (7) intentional infliction of emotional distress, (8) negligent infliction of emotional distress, (9) breach of fiduciary duty, (10) constructive fraud, (11) unjust enrichment, and (12) unjust enrichment as a result of good faith belief induced by the Bank Defendants' behavior.

Plaintiffs alleged eight additional causes of action (the indirect causes of action) based upon a theory of the Bank Defendants' alleged derivative liability through Knudsen: (13) Breach of contract, (14) breach of implied covenant, (15) fraud/misrepresentation, (16) negligent misrepresentation, (17)

intentional infliction of emotional distress, (18) negligent infliction of emotional distress, (19) breach of fiduciary duty, and (20) constructive fraud.

Causes of action 1 through 10 and 14 through 20 allege that as a proximate result of the Bank Defendants' wrongful conduct,

> individual MILK PRODUCERS have suffered anxiety, humiliation, worry, mental anguish and emotional and physical distress * * * and have been injured in mind and body all to their general damage * * *.

Other injuries alleged were that plaintiffs incurred medical expenses, were prevented from pursuing normal employment, suffered a loss of income and business advantage, and suffered loss of consortium.

In the prayer for relief, plaintiffs sought damages for mental suffering, emotional distress, and loss of consortium in every cause of action except Nos. 11, 12, and 13.  They also sought damages for medical and related expenses and for lost earnings in every cause of action.

The alleged behavior giving rise to the complaint was that the Bank Defendants made risky loans to Knudsen for the purchase of Foremost, knowing that both Knudsen and Foremost were highly leveraged and vulnerable.  As the direct lender, Citicorp took security interests in all of Knudsen's assets,[4] thereby putting

---

[4]    The other Bank Defendants were participants in the loan (i.e., they bought parts of the loan after it was made) and did not have direct security interests.

in jeopardy payment to plaintiffs and other creditors.  The complaint also alleged that the banks continued to give false assurances of Knudsen's solvency, inducing plaintiffs to continue to supply milk for a longer period than they otherwise would have, so that the banks' security interests would be enhanced to the detriment of plaintiffs.[5]  The indirect causes of action stem from the allegation that the financing arrangements were such that they gave the banks virtual control over Knudsen and were thus indirectly responsible for its actions.  The Bank Defendants denied the allegations.

The amounts claimed as general damages in Exhibit A attached to the complaint are approximately equal to the milk losses.

The milk producers were represented by Michael J. Bidart (Bidart) of Shernoff, Bidart & Darras.  William J. F. Roll III (Roll) of Shearman & Sterling represented the Bank Defendants.

The milk producers action was part of a larger coordinated proceeding entitled Coordination No. 2138, which involved the Knudsen matter and included approximately 20 different lawsuits against the Bank Defendants.  Generally, five groups or subsets of plaintiffs were represented.  One set was the milk producers litigation, which eventually was resolved in a settlement that included plaintiffs from a separate suit filed by the Danish

---

[5]    The milk producers, in fact, lost payment for 4 weeks' worth of raw milk worth about $30 million before Knudsen began paying on a daily, C.O.D. basis.

Creamery Association (Danish Creamery), another cooperative also represented by Bidart. The Danish Creamery plaintiffs are not petitioners in this case.

The coordinated proceedings included four other lawsuits. One was a single suit brought by Knudsen and certain affiliates and subsidiaries, known at the time as K.F. Dairies, Inc. Another was also a single action brought by parties (known as the F.D. partners) who had sold their stock in Foremost to Knudsen and had received security interests that were subordinated to those of the banks.

In addition, Citicorp filed separate cross-complaints against K.F. Dairies, Inc., and the F.D. partners for indemnification. Citicorp's suit against K.F. Dairies was based on claims stemming from the loan and security agreement between Citicorp and Knudsen. Its suit against the F.D. partners was not based on contract but on a theory of equitable indemnity.[6]

---

[6] The related suits were conditionally settled in an agreement dated Aug. 23, 1990. The settlement was subject to various conditions and events in the future. Unlike the situation of the milk producers settlement of Aug. 13, 1990, this settlement required the approval of the bankruptcy court.

One contingency in the Aug. 23 agreement was the banks' obtaining releases by the milk producer plaintiffs of their claims as unsecured creditors of the bankruptcy estate, in return for an assignment by Knudsen of its causes of action for breach of fiduciary duty against its individual directors and officers.

The agreement called for a plan of reorganization of Knudsen and its affiliates to be jointly proposed by all the various parties (not including the milk producers), reflecting an agreed division of the remaining assets in the estate. When the

(continued...)

All of the coordinated lawsuits were assigned to Judge Jack Tenner.

The Milk Producers Settlement

On July 30, 1990, Judge Tenner held a settlement hearing on the milk producers action.  The parties orally stipulated that all causes of action alleged in the milk producers complaint be dismissed, except for negligent infliction of emotional distress.  The Bank Defendants would pay $20 million as payment in full for that cause of action.  Judge Tenner specifically found, on the record, that the claims pending in the Knudsen bankruptcy proceeding were "for the production and delivery of milk which was not paid for", and that the settlement in the milk producers action did not affect the rights of plaintiffs to receive payment elsewhere for the lost milk.

The judge then added:

The Court has been with this litigation for some time and has read all of the allegations, and finds that the negligent infliction of emotional distress is a much more serious claim as far as the individual farmers are concerned; and, therefore, that would be the basis of the allocation, plus my familiarity with file cabinets full of paper in this lawsuit.

Judge Tenner also stated his understanding that the settlement

_____

[6](...continued)
reorganization was finally confirmed and effected, the lawsuits would be finally dismissed with prejudice.
    The record does not reflect whether or when the cases were actually dismissed with prejudice.

applied to all plaintiffs who were Attorney Bidart's clients.

The judge stated he would approve the settlement, which was to be reduced to writing, and that negotiations on the language would begin the next night.

Roll, the banks' lawyer, prepared the first draft of the settlement agreement. The Bank Defendants' concern was twofold: That all claims be released and that none of the money being paid could fairly be said to arise out of gross negligence or willful misconduct. That was because the banks wanted to preserve a right to indemnification by Knudsen (now KF Dairies) set out in the loan and security agreements that financed the Foremost purchase. Although Knudsen was bankrupt, the banks were secured creditors and hoped to recoup as much as possible of their payment to the milk producers. This left nine possible causes of action on which to structure a settlement; i.e., Nos. 2, 4, 6, 8, 12, 13, 14, 16, and 18.

Roll was familiar with evidence, in the form of depositions and answers to written interrogatories, of particularized emotional distress suffered by several dozen milk Producer plaintiffs.

In focusing on the emotional distress issue, the Bank Defendants were also heavily influenced by an earlier off-the-record conversation with Judge Tenner, who was actively involved in the settlement talks. The banks' consistent position was that

they were not liable for claims arising out of the contract between Knudsen and the milk producers for delivered and unpaid raw milk. Judge Tenner had seen the depositions and answers to interrogatories filed by dozens of dairy farmers. He expressed strong views that a jury would not care about the "technical details" but would be very sympathetic to the milk producers' individual testimony about claimed distress.[7]

The judge told the Bank Defendants' counsel that in front of a jury, they could "get killed", because they were representing five large financial institutions, and plaintiffs were a thousand dairy farmers around the State of California.

Although the parties had indicated to Judge Tenner at the settlement hearing that the entire amount would be attributed to negligent infliction of emotional distress, the final written agreement attributed $19,328,966 to that claim and $671,034 to negligent interference with contractual relationship (the fourth cause of action in the Complaint, which also sought both general damages and damages for mental suffering and emotional distress). The parties wanted to be sure all plaintiffs, including entities, were covered by the settlement.

---

[7] Respondent objected to the admission of Judge Tenner's comments as hearsay. Those comments are received not for the truth of the matter asserted but for the effect of Judge Tenner's views on the chief negotiator for the Bank Defendants.

To accomplish these goals, the settlement document did not require any specific allocation to specific plaintiffs but left allocation and distribution up to plaintiffs' counsel.  Paragraph 2(c) of the settlement agreement provides as follows:

> (c)  <u>Without reference to and without affecting the allocation or distribution of the Settlement Payment among the various parties plaintiff</u>, the Settlement Payment [$20 million] shall be attributed as follows:
>
> > (i)  Six Hundred Seventy-one Thousand Thirty-Four Dollars ($671,034.00) shall be attributed to the so-called "direct" cause of action in the Milk Producers Complaint for negligent interference with contractual relationship (the fourth cause of action); and
> >
> > (ii)  Nineteen Million Three Hundred Twenty-eight Thousand Nine Hundred Sixty-six Dollars ($19,328,966.00) shall be attributed to the so-called "direct" cause of action in the Milk Producers complaint for negligent infliction of emotional distress (the eighth cause of action);
> >
> > (iii)  Nothing shall be attributed to any of the other causes of action in the Milk Producers Complaint or to any cause of action in the Danish Creamery complaint.

[Emphasis added.]

Neither the Bank Defendants nor the milk producers wanted to settle on any basis relating to the contracts between Knudsen and the milk producers.  The banks consistently denied any liability on the contracts, and plaintiffs wanted to retain their direct claims for nonpayment of milk against the bankruptcy estate.  Moreover, such a settlement would have required the bankruptcy

court's approval, which was not necessary under the agreement reached.

On August 13 and 14, 1990, a settlement agreement was signed, binding the Bank Defendants on one hand and the milk producers and Danish Creamery on the other.  The Bank Defendants agreed to pay a total of $20 million in exchange for release of all of the milk producers and Danish Creamery claims.  Funds were to be distributed among plaintiffs in both suits by plaintiffs' counsel.

The record is not clear exactly how the $20 million was allocated among the plaintiffs.  While there seems to be some relationship between the amount recovered and the lost milk money, there was not a pro rata distribution based on an exact percentage.  For instance, petitioners recovered the following amounts:

| Petitioners | Amount Owed | Recovered | Percent |
| --- | --- | --- | --- |
| Knevelbaard | $58,500 | $31,391 | 53.7 |
| Gomes | 118,369 | [1]62,368 | 52.7 |
| Kooistra | 10,000 | 4,993 | 49.9 |
| Christian | 12,719 | 6,487 | 51.0 |
| A.L. Souza | 37,000 | 18,721 | 50.6 |
| P.A. Souza | 37,000 | 18,721 | 50.6 |
| Brown | 16,105 | 8,545 | 53.1 |

[1]Petitioners Gomes received $2,012 of this amount in 1991.

Because both sides wished to retain their contract-based claims in other proceedings or against other parties, paragraph 6 of the settlement provided:

> Nothing in this Settlement Agreement in any way affects, either directly or indirectly:
>
> (a) The rights, if any, of the Milk Producers or Danish Creamery to assert their claims in the pending KF Dairies bankruptcy proceedings or to receive distributions or other compensation in those proceedings. In the event that any such distribution is received by the Milk Producers or Danish Creamery, Bank Defendants shall not receive any credit for any distribution because the sums paid in connection with this settlement are not attributable to the contractual claims asserted by the Milk Producers and Danish Creamery in the bankruptcy proceedings;
>
> (b) The rights, if any, of the Milk Producers or Danish Creamery to compromise those bankruptcy claims or to dispose of them in any other way;
>
> (c) The rights, if any, of the Milk Producers or Danish Creamery to participate in those bankruptcy proceedings as parties-in-interest;
>
> (d) Bank Defendants' rights, if any, to assert claims for indemnity against any other entity or party; and
>
> (e) The rights or liabilities, if any, of any other entities or parties in the coordinated proceedings or in the insolvency proceedings.

After the milk producers action settled, petitioners (and all other milk producers) still had outstanding claims in the Knudsen bankruptcy action for the value of the milk. Most of the milk producers released their bankruptcy claims in exchange for an assignment by Knudsen of its causes of action for breach of fiduciary duty against its individual directors and officers.

They recovered small additional amounts from the directors and their insurance company.  For instance, Knevelbaard received $5,048.32 on a $58,500 loss; Gomes received $6,368 of $118,369.

OPINION

Evidentiary Matters

Petitioners reserved several objections in the stipulation of facts.

One group of objections centers around the admission of documents or facts concerning lawsuits, other than the milk producers action, related to the Knudsen default.  These concern, for instance, (1) petitioners' release of claims in the bankruptcy action in exchange for an assignment of Knudsen's claims against its directors and their insurer; (2) the banks' indemnification rights against Knudsen and Foremost; and (3) the Danish Creamery complaint.  We believe the exhibits in groups 1 and 2 are relevant to the parties' motivations in structuring the settlement.  The Danish Creamery complaint may have slight relevance, since its plaintiffs were included in the milk producers settlement; however, since the complaint was dismissed in its entirety, we give it little weight.

Another group of disputed stipulations shows that petitioners did not receive treatment from mental or physical health care workers as a result of actions by the Bank Defendants.  Petitioners also object to stipulations as to some

of them concerning the absence of loss of consortium.  They contend these facts are irrelevant in proving whether they actually suffered emotional or physical distress.  We think this objection goes to the weight of the evidence, not to its relevance.  Certainly, if petitioners had incurred such expenses, the evidence would be admissible.  Accordingly, petitioners' objections are overruled.

Paragraphs 87, 97, and 109 of the stipulation (in re the Christians, Arnold Leroy and Rosemary Souza, and the Browns) state that petitioners:

> admit that the actual division of settlement proceeds among all of the Milk Producer Plaintiffs was made on the basis of the quantities of milk delivered by each of the Milk Producer Plaintiffs and not on the amount of emotional distress suffered by them.

We believe the first half of the statement is relevant to show how the distribution was administered; however, as shown above, all petitioners did not receive the same percentage of their lost revenue.  And even if the distribution was made using the lost revenue as an administratively convenient rule of thumb, it does not follow that the proceeds were awarded for something other than emotional distress.  The statement is relevant if read to mean only that no individualized assessment of emotional damage as to each of the 1,000 plaintiffs was separately made.  With that understanding, the objection is overruled.

Other disputed paragraphs seek to establish that petitioners' representatives in the milk producers action utilized tax advice regarding the settlement. Since this may be relevant to the motivation of the parties in structuring the settlement, we overrule the objection.

Petitioners also object to paragraph 51 and Exhibit 21-U on the basis of rule 408 of the Federal Rules of Evidence. The exhibit is a letter from plaintiffs' attorneys to the Bank Defendants' attorneys, regarding an offer of settlement. The letter is not admissible to show liability for or invalidity of the claim. It is admissible to show other circumstances surrounding the negotiations; however, we note that the offer bears little or no relation to the final settlement, either in amount or structure, and we give it little weight.

Finally, we overrule petitioners' objection to Exhibit 35-AI, stipulation re amendment of Exhibit A to milk producer plaintiffs' third amended complaint. It is an intrinsic part of Exhibit 16-P, the complaint, which has been stipulated and forms an important part of the evidence. Exhibit 35-AI is received.

The Settlement

Respondent contends the settlement payment was really for the lost milk under the contract between the milk producers and Knudsen. Petitioners contend it was for emotional distress, as

delineated in the settlement agreement.  We agree with petitioners.

Section 61(a) provides a broad definition of "gross income": "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived".  Thus, petitioners' settlement proceeds constitute gross income unless expressly excepted by another provision in the Code. Commissioner v. Schleier, 515 U.S. 323, 328 (1995).  Petitioners claim the settlement award falls within section 104(a)(2), which excludes from gross income "the amount of any damages received * * * on account of personal injuries or sickness".

Section 1.104-1(c), Income Tax Regs., provides:

Section 104(a)(2) excludes from gross income the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness.  The term "damages received * * *" means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution.

Thus, petitioners must meet two independent requirements to exclude the recovery under section 104(a)(2):  First, they must demonstrate that the underlying cause of action giving rise to the recovery is based upon tort or tort type rights; and second, they must show that the damages were received on account of personal injuries or sickness.  Commissioner v. Schleier, supra at 337.

Respondent contends that petitioners have satisfied neither test.  Respondent argues that "the Milk Producers' recovery arose out of garden-variety breach of contract and economic-injury torts stemming from the breach."  Further, says respondent, the proximate cause of the damages petitioners recovered was economic injury from Knudsen's breach of its contractual duty to pay for delivered milk.

Origin of the Claims:  Tort or Tort Type Rights?

Respondent contends that "The primary focus of the Milk Producers Complaint and the counts alleged therein was Knudsen's contractual relationship with petitioners and the breach of that relationship."  We disagree.

The tax consequences of a settlement depend on the nature of the litigation and on the origin of the claim but not on the validity of that claim.  Woodward v. Commissioner, 397 U.S. 572 (1970); United States v. Gilmore, 372 U.S. 39 (1963).  Thus the classification of a claim is extremely important.

In United States v. Burke, 504 U.S. 229 (1992), the Court defined a tort as "'a civil wrong, other than a breach of contract, for which the court will provide a remedy in the form of an action for damages.'"  Id. at 234 (quoting Keeton et al., Prosser and Keeton on the Law of Torts 2 (1984)).  The primary characteristic of "an action based upon tort type rights" is the availability of compensatory remedies.  Commissioner v. Schleier,

supra at 333. Such remedies are intended to redress intangible elements of injury that are deemed important, even though not pecuniary in their immediate consequences. These injuries may include emotional distress, pain and suffering, impairment of reputation, personal humiliation, and mental anguish. United States v. Burke, supra at 235-236.

Here, under 17 of the 20 causes of action alleged, petitioners sought damages for mental suffering and emotional distress. They also sought general damages and interest and, in some causes of action, exemplary and punitive damages. Of the 12 causes of action based upon the Bank Defendants' direct liability, Nos. 1 through 10 are clearly torts or tortlike. In fact, of the 20 causes of action, direct and indirect, at most 4 (Nos. 11, 12, 13, and arguably 14) do not sound in tort.

The origin of the milk producers' complaint against the banks was that they made risky loans to Knudsen, knowing that it was financially shaky, under conditions which practically guaranteed they (the banks) would be repaid at the expense of the milk producers. The complaint also alleged that the banks lied to the milk producers to induce them to continue to provide milk after the banks knew that Knudsen was about to default, thereby putting the plaintiffs in more jeopardy, and causing foreseeable harm, all to make themselves more secure. This was a claim

separate and apart from plaintiffs' contract claims against Knudsen.

The origin of the claim for milk losses (raised in the bankruptcy court and in claims against Knudsen's directors) was Knudsen's breach of contract. However, the milk producers had no contract with the banks. The origin of the claims in the milk producers action against the banks was the Bank Defendants' behavior. We think it significant that the settlement agreement did not foreclose petitioners' rights to collect the full amount of milk proceeds in other arenas. In fact, they did eventually collect small amounts from the directors' insurance.[8]

We hold that the milk producers action was based upon tort or tortlike rights.

Personal Injuries or Sickness

Finally, we examine whether the proceeds were paid "on account of" the emotional harm done. Respondent argues they were paid on account of Knudsen's default and not on account of petitioners' emotional distress. We disagree. Petitioners'

---

[8] See Banks v. United States, 81 F.3d 874 (9th Cir. 1996), where the Court of Appeals for the Ninth Circuit, the court to which this case is appealable, held that a claim against a union for breach of duty of fair representation is tortlike and distinct from a claim against the employer for unjust discharge, even though the settlement amount paid by the union was based on an estimate of past and future wages. "Unions do not pay wages to their members, and what the Union paid in settlement * * * did not constitute wages", id. at 876, but damages to compensate the taxpayer for its unfair and arbitrary treatment. Thus, the claim against the union was tortlike. Here, we might say: "Banks don't buy milk."

claims against the banks were (except for the derivative claims, which were dismissed by agreement) separate and apart from their claims against Knudsen.  While petitioners undoubtedly suffered emotional harm from the default itself, they alleged additional and separate harm caused by the banks' violation of duties owed to them.  Moreover, the settlement did not affect or limit their right to pursue any and all claims for lost milk money in bankruptcy or another forum.

Petitioners must prove their recovery was received on account of personal injuries or sickness.  Respondent points to the lack of bills for medical or psychiatric treatment and the lack of personalized proof of individual damages, arguing that the recovery was simply payment for the lost milk, not for emotional distress.  Again, we disagree.

"Personal injury" within the meaning of section 104(a)(2) comprehends both tangible and intangible harms.  Commissioner v. Schleier, 515 U.S. at 329 n.4 (citing Justice Scalia's concurring opinion in United States v. Burke, supra at 244 n.3, acknowledging that "personal injuries or sickness" includes nonphysical injuries).  Traditional harms associated with personal injury are pain and suffering, emotional distress, harm to reputation, or other consequential damages.  United States v. Burke, supra at 239.

While the incurring of expenses for medical or psychiatric treatment would be relevant to show harm, they are not required in order to prove that stress was endured. Petitioners' testimony convinces us that their experiences produced serious and prolonged stress. Proof of emotional distress is not limited to the presentation of medical bills.[9]

Nor do we think the fact that the damages were <u>distributed</u> in approximately proportionate shares of the defaulted milk payments proves that they were not <u>received</u> for emotional distress. Awards for personal injuries may be <u>measured by</u> lost income and still be excluded under section 104(a)(2). "If a taxpayer receives a damage award for a physical injury, which almost by definition is personal, the entire award is excluded from income even if all or a part of the recovery is determined with reference to the income lost because of the injury." <u>Threlkeld v. Commissioner</u>, 87 T.C. 1294, 1300 (1986), affd. 848 F.2d 81 (6th Cir. 1988); see also <u>Banks v. United States</u>, 81 F.3d 874 (9th Cir. 1996).

Furthermore, there were nearly 1,000 dairy farmer plaintiffs. To have assessed the individualized emotional harm suffered by each would have been exceedingly time consuming and

---

[9] Although Souza suffered a stress-related heart attack in 1988, and undoubtedly incurred medical expenses, as one of 1,000 plaintiffs he was not asked for, nor did he give, a personal description of his medical situation to the lawyers for either side.

expensive, if not administratively impossible, resulting in a smaller recovery to each plaintiff. The pro rata distribution was a practical, commonsense solution under the circumstances.

Petitioners rely on Seay v. Commissioner, 58 T.C. 32 (1972). There the taxpayer received a settlement of $105,000 for breach of contract and personal injuries arising from embarrassing publicity. The settlement allocated different amounts to the various plaintiffs for salary but identical amounts for personal injury. A letter confirming the distribution of the settlement funds was signed by the principal negotiators from both sides. The letter stated that the settlement consisted of salary ($60,000 for Mr. Seay) and additional sums to compensate the parties for "personal embarrassment, mental and physical strain and injury to health and personal reputation in the community". Id. at 35. We held that the letter helped to establish that the nature of the claim was for personal injuries, the additional $45,000 should be excluded from gross income, and only $60,000 should be recognized as salary and ordinary income.

Here, Roll, the banks' chief negotiator, testified that the money was paid "not for the value of milk, but for the value, if you will, of the emotional distress claims asserted by these individual producer plaintiffs."

Respondent points to the lack of an adversarial relationship between the Bank Defendants and petitioners in structuring the

settlement. Petitioners' concern was in receiving as much money as possible. The banks, however, were very concerned about which of petitioners' claims was the basis for the settlement agreement; they wanted to avoid claims based on gross negligence or willful misconduct, in order to protect their right to indemnity.

In Robinson v. Commissioner, 70 F.3d 34 (5th Cir. 1995), affg. in part and revg. in part on another ground 102 T.C. 116 (1994), the taxpayers obtained a $60 million jury verdict against a bank for wrongful failure to release a lien. The award included $6 million for lost profits, $1.5 million for mental anguish, and $50 million in punitive damages. While the trial court was considering the bank's motion for a new trial, the taxpayers settled their claims against the bank for $10 million. In the final judgment reflecting the settlement, which was drafted by the parties and signed by the trial judge, 95 percent of the settlement proceeds were allocated to mental anguish and 5 percent were allocated to lost profits. The taxpayers excluded the 95 percent under section 104(a)(2).

The Court of Appeals agreed with the Tax Court's finding that the allocation was not entered into in a bona fide adversary proceeding and that the judgment was simply "rubber stamped" by the State court. The testimony of the attorneys who represented the taxpayers in their suit against the bank supported this Court's finding that the bank allowed the Robinsons to allocate

the settlement proceeds in any way they wished.  The circumstances surrounding the State court judge's entry of judgment also supported those findings, in that the parties presented the final judgment to the judge at his home in the evening, the meeting lasted no longer than 1 hour, and neither the final judgment nor the settlement agreement was discussed in detail during that meeting.  Therefore, the Tax Court did not give conclusive effect to the State court judgment's allocation of settlement proceeds and instead allocated the proceeds on the basis of the jury verdict, "the best indication of the worth of the Robinsons' claims."  Robinson v. Commissioner, supra at 38.

This case is distinguishable from Robinson.  There the allocation had no relationship to the jury award and was not entered into by the parties in an adversarial context at arm's length.  Here, in contrast, although the parties' interests were not directly adverse as to the structure of the settlement, there was a bona fide basis for it aside from the tax consequences. First, the emotional distress claim was not an afterthought; 85 percent (17 of 20) of the causes of action alleged in the complaint sought damages for emotional distress.  Second, the Bank Defendants' chief lawyer was familiar with dozens of depositions and answers to interrogatories of the plaintiffs alleging emotional harm, and he believed the Bank Defendants were vulnerable on those claims.  Third, Judge Tenner was familiar

with the testimony of the farmers and was influenced by it.[10] He did not "rubber stamp" the agreement, but made specific findings on the record approving the settlement.  At the recorded hearing the judge specifically found that the claim of negligent infliction of emotional distress was the most serious claim and that the settlement based upon it was appropriate.

Respondent also relies on Every v. IRS, 74 AFTR 2d 94-5614, 94-2 USTC par. 50,478 (W.D. Wash. 1994), affd. without published opinion 51 F.3d 279 (9th Cir. 1995).  The taxpayers, commercial salmon fishermen, sought a refund for taxes paid as the result of a settlement against Exxon for damages suffered as a result of the Exxon Valdez oil spill in Cook Inlet, Alaska.  The court held that, while their claim sounded in tort, it did not arise from an injury to the person in the traditional tort sense.  Rather, it was economic in nature, to redress the loss of plaintiffs' livelihood from fishing.  The court drew an analogy to the loss a farmer might suffer whose crop is destroyed by a crop duster negligently using DDT.  The brief opinion of the District Court discloses the facts only in broad outline, and the affirmance is by unpublished opinion.  Here, in contrast, (1) the agreement is unambiguous as to the reason for the payment, (2) petitioners claimed emotional distress in nearly every cause of action in the

---

[10]     Knevelbaard was one of the dairymen whose depositions were taken in the milk producers action.

complaint, and (3) the Bank Defendants were aware of the specific emotional harm done to dozens of the plaintiffs, through their depositions and answers to interrogatories.  Every is not controlling.

We therefore hold that the underlying claim giving rise to the recovery was based upon tort or tortlike rights, and that the settlement proceeds were received on account of personal injuries.  The amounts recovered are excludable from income under section 104(a)(2).

To reflect the foregoing,

Decisions will be entered
for petitioners.