T.C. Memo. 2005-223

UNITED STATES TAX COURT

CHARLES E. AND NOEL K. BRADLEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19074-02.          Filed September 26, 2005.

Ps excluded $12 million of a $76 million
settlement from gross income for the 1995 taxable year
pursuant to sec. 104 (a)(2), I.R.C.  R determined the
$12 million was not excludable.

<u>Held</u>:  Ps are not entitled to exclude the $12
million settlement amount from gross income.

Charles E. and Noel K. Bradley, pro sese.

<u>Robert E. Marum</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  Respondent determined a deficiency in

petitioners' Federal income tax for the 1995 taxable year in the

amount of $4,676,578 and a penalty pursuant to section 6662(a) in

the amount of $914,025.[1]  After concessions,[2] the sole issue for decision is whether the $12 million petitioners received pursuant to a settlement is excludable from income under section 104(a)(2).

FINDINGS OF FACT

I.  Background

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.  At the time this petition was filed, petitioners resided in Darien, Connecticut.  Noel K. Bradley is a party to this case only because she filed a joint Federal income tax return with her spouse, Charles E. Bradley (petitioner or Mr. Bradley), for their 1995 tax year.

Mr. Bradley received his bachelor's degree in economics from Yale University in 1951 and his M.B.A. degree in accounting from New York University School of Business in 1957.  After his graduation from Yale, petitioner worked at Price Waterhouse until 1953 when he joined the U.S. Navy as a lieutenant junior grade. He returned to Price Waterhouse in 1956 where he continued to work until 1967, eventually becoming a general partner of the

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code for the year in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] By stipulation, respondent conceded the sec. 6662(a) penalty, and petitioners conceded all other adjustments for 1995 as listed in the notice of deficiency.

accounting firm. From 1967 to 1971, petitioner worked as an executive vice president of the investment banking firm, Laird, Inc., starting his career in leveraged buyouts. Since 1967, petitioner has served in executive and board positions with many companies, including president of Stanwich Investment Co. and Stanwich Partners, Inc. (Stanwich). During 1992-95, petitioner was embroiled in a number of lawsuits related to his business endeavors, the settlement of six of which resulted in the settlement payments at issue in this case (the Six Lawsuits).[3]

---

[3] The Six Lawsuits in which petitioner was involved are as follows (and as identified in the parties' joint stipulated Exhibit 79-J and herein by number): (1) Bradley v. Boyle, C.A. No. 5:92CV171(S) (N.D.W.Va., Oct. 7, 1992); (2) Bradley v. Boyle, C.A. No. 5:94CV29(S) (N.D.W.Va., May 24, 1994); (3) Ormet Corp. v. Bradley, C.A. No. 5:93CV21(S) (N.D.W.Va., Jan. 20, 1993); (4) Boyle v. Boyle, C.A. No. 87-C-772 (W.Va. Cir.Ct., Mar. 31, 1994), affd. sub nom. Boyle v. Boyle, No. 22564 (W.Va., June 16, 1995); (5) Boyle v. Bradley, C.A. No. 5:94CV33(S) (N.D.W.Va., Mar. 31, 1994); and (6) Bradley v. McCamic, C.A. No. 5:95CV62(S) (N.D.W.Va., May 18, 1995). This opinion for purposes of historical context first discusses several of the other cases and then, discusses each of the Six Lawsuits to determine whether any of the $76 million settlement was made for personal injury claims and if so, whether those personal injury claims were tort-like as described in sec. 104(a)(2).

A settlement term sheet, dated Aug. 7, 1995 (Settlement Term Sheet), see infra, lists Ormet Corp. v. Bradley, C.A. No. 5:92CV639 (WWE) (N.D. Conn. Nov. 2, 1992), as one of the Six Lawsuits to be settled. This case was removed to the United States District Court for the Northern District of West Virginia, following a consent order by Judge Eginton, where it was recaptioned as the aforementioned lawsuit number three, above, and subsequently, dismissed by Judge Stamp. See infra note 33.

A.    Ownership of Oralco, Inc.

In 1986, petitioner, together with Robert E. Boyle (Mr. Boyle), and William R. Strothotte[4] (Mr. Strothotte), founded and incorporated Oralco, Inc. (Oralco, or following a name change after its reorganization, in 1994, Ormet),[5] a Delaware corporation with its principal place of business in Wheeling, West Virginia.  During 1990 through 1995, Oralco was a holding company owning 100 percent of the stock of Ohio River Associates, Inc. (ORA), and Oralco Management Services, Inc. (OMS).  From 1992 through 1995, OMS served as the managing company for the original Ormet.  ORA owned 100 percent of the stock of Ormet Corporation[6] (Ormet, or following a name change after its reorganization, in 1994, Ormet Primary Aluminum Corporation), a corporation organized under the laws of Delaware with its principal place of business in Hannibal, Ohio.  ORA, like Oralco,

---

[4] Mr. Strothotte was a metals trader and president of Clarendon, Ltd., a firm investing in companies associated with metals-trading.

[5] In 1994, Oralco acquired the assets of Consolidated Aluminum Corporation (Conalco).  These assets consisted primarily of rolling mills, a recycling plant, and a foil plant.  As a result of the Conalco acquisition, the names and structure of the corporations changed. During 1994, Oralco changed its name to Ormet Corporation, and the original Ormet Corporation changed its name to Ormet Primary Aluminum Corporation.

[6] In 1986, Mr. Boyle led a leveraged buyout to acquire Ormet.  Petitioner and Mr. Strothotte also participated in the buyout, and in 1989, Mr. Boyle, petitioner, and Mr. Strothotte became the sole owners of Ormet.  Oralco was formed as the holding company for Ormet.

was a Delaware corporation, headquartered in Wheeling, West Virginia. Ormet was engaged in the production of commodities, specifically alumina, primary aluminum, and fabricated aluminum products.

Prior to April 21, 1992, Oralco stock was held by Mr. Boyle (48.387 percent), Mr. Strothotte (19.355 percent), and petitioner, individually and as trustee of a voting trust (32.258 percent).[7] At all relevant times, Oralco had 1,000,000 shares authorized but only had 500,000 shares issued and outstanding. On October 11, 1989, Mr. Boyle, Mr. Strothotte, and petitioner entered into a stockholder's agreement (1989 Stockholder's Agreement) whereby, inter alia: (1) Each stockholder had the right to designate one of the three members of Oralco's board of directors, (2) each stockholder agreed not to sell his shares to any other stockholder, except as permitted by the agreement, and (3) termination of the agreement was allowed by a stockholder holding shares representing at least two-thirds of the voting power of all outstanding Oralco shares.

---

[7] The voting trust of Oct. 11, 1989, was between petitioner, John G. Poole (Mr. Poole), and Lawrence A. Siebert (Mr. Siebert), collectively doing business as Stanwich Partners. Petitioner served as the voting trustee of this trust. Under the voting trust, Mr. Bradley had the exclusive right to vote all Oralco shares owned by him, Mr. Poole, and Mr. Siebert. Thus, for simplicity, Mr. Bradley is treated as the owner of the shares for purposes of the corporate control actions recounted in this opinion.

B.    The Signal and Costar Loans

During 1992 through 1995, petitioner, Mr. Seibert (through 1993), and Mr. Poole were shareholders in Stanwich, a Delaware corporation.  Petitioner and Stanwich guaranteed a loan in the original amount of $19,490,692 from Signal Capital Corporation (Signal) to Oneida Products Corp. (Oneida) by guaranty agreements dated August 17, 1988, as amended August 12, 1991.  Shortly thereafter, in 1992, Signal commenced a lawsuit against petitioner and Stanwich in the Superior Court of the State of Connecticut[8] (Connecticut Superior Court) to collect on loan guaranties made by petitioner and Stanwich with respect to the Oneida loan.  As of October 20, 1992, Signal obtained a prejudgment attachment of all of petitioner's right, title, and interest in 95,000 Oralco shares.  As security for the Signal loan, petitioner, by agreement dated October 29, 1992, pledged to Signal his voting trust certificate for the 95,000 Oralco shares.  Then, on January 7, 1994, the Connecticut Superior Court issued a judgment in favor of Signal and against petitioner and Stanwich in the principal amount of $24 million with respect to the loan guaranty.[9]

---

[8] The action was titled Signal Capital Corp. v. Bradley & Stanwich Partners, Inc., docket No. CV-92-0127300-S (Jud. Dist. of Stamford, Conn. Super. Ct. 1992).

[9] As discussed infra, on Aug. 17, 1995, in conjunction with the terms of the Implementing Agreement dated Aug. 18, 1995, Signal terminated its liens against petitioner and other parties.
(continued...)

Petitioner also guaranteed two loans, one in 1988 and one in 1991, to Costar Corporation (Costar). These notes payable to Costar were known as the "Somerset" note and the "Holdings" note, respectively. In 1992, Costar filed suit against petitioner in the United States District Court for the District of Connecticut to enforce petitioner's guaranties. The district court entered judgment November 30, 1992, wherein petitioner agreed that as of January 3, 1992, he and Pierre R. Debroux as guarantors owed Costar $3,231,085.80 and $1,430,000 for the Somerset and Holdings notes, respectively.[10]

## II. The Six Lawsuits

A. <u>Bradley v. Boyle, Oralco, OMS, ORA, Ormet, Michael J. O'Brien, and O'Sullivan, Graev & Karabell (Oralco/Ravenswood Exchange of Stock)</u>

In 1989, petitioner, together with Mr. Boyle and Mr. Strothotte, bought out an aluminum processing company named

---

[9](...continued)
In the Implementing Agreement, petitioner, in order to settle the Signal claims under its judgment, the loan agreement, and related documents, agreed to a cash payment in the amount of $27 million and a $4 million promissory note from Mr. Bradley payable to Signal.

[10] A judgment was entered in the total amount of $4,661,055.80 as the sum of the principal balances under the Somerset and the Holdings notes plus costs, accrued but unpaid, interest, and attorney's fees. Because the sum of the amounts due under the two notes is actually $4,661,085.80, the Court assumes the small difference represents a typographical error.

Ravenswood Aluminum Corporation (Ravenswood),[11] principally located in Ravenswood, West Virginia. Petitioner claimed that on August 1, 1991, he was induced by Mr. Boyle and Oralco's counsel, Michael J. O'Brien (Mr. O'Brien), to enter into an oral "stand still" agreement with Mr. Boyle (Boyle Agreement) whereby each agreed that neither of them would sell to, or transfer to, or buy Oralco shares from Mr. Strothotte.[12] Petitioner also contended that he agreed to enter into the Boyle Agreement due to concerns that Mr. Strothotte had too much control over Ravenswood and would damage Oralco if he gained control. On April 21, 1992, Mr. Boyle made an agreement with Mr. Strothotte to exchange his Ravenswood shares for Mr. Strothotte's Oralco shares. Mr. Boyle

---

[11] Ravenswood Aluminum Corporation is sometimes referred to in the stipulation of facts and exhibits as "Ravenswood" or "Ravenswood, Inc." (collectively referred to herein as Ravenswood).

[12] Petitioner claimed that the oral agreement also entailed that:

> both he and Boyle would continue to jointly vote their shares and Director votes to maintain joint control of Oralco; and he and Boyle would combine their share ownership and Director votes in the long-term best interests of Oralco in order to reach an agreement by which one would purchase the other's common stock in Oralco; but if Strothotte made a substantial unsolicited, unconditional cash offer for the Oralco shares of either Bradley or Boyle before a definitive agreement was reached between them, the other must be advised of such offer and granted a 'last look' or right of first refusal to purchase such common shares. [Oralco, Inc., et al. v. Bradley, Civ. A. No. 12763, 1992 WL 373041 (Del. Ch. Dec. 17, 1992).]

explained this by denying that any enforceable Boyle Agreement existed.

The exchange of Mr. Boyle's Ravenswood shares for Mr. Strothotte's Oralco shares allowed Mr. Boyle to become a greater than two-thirds majority shareholder in Oralco and to terminate the 1989 Stockholder's Agreement regarding Oralco, which he did immediately. Thereafter, Mr. Boyle and Mr. Strothotte informed Mr. Bradley by letter[13] that he had been removed as a director of Oralco and its subsidiaries, in accordance with the termination provision of the 1989 Stockholder's Agreement. Mr. Boyle appointed himself as sole director of Oralco and its related entities.[14]

In response, on October 7, 1992, petitioner filed a lawsuit against Mr. Boyle, Oralco, OMS, ORA, Ormet, attorney Mr. O'Brien, and the law firm of O'Sullivan, Graev & Karabell (OGK) in the United States District Court for the Northern District of West

---

[13] The letter to petitioner effectuating his removal was actually dated Apr. 20, 1992. The letter was incorrectly dated because the documents were drafted on Apr. 20, 1992, but they were not signed until after midnight. Thus, the documents should have been properly dated Apr. 21, 1992. Vice Chancellor Chandler in Oralco, Inc., et al. v. Bradley, supra, granted the motion to amend the complaint to conform plaintiff's pleadings to this fact.

[14] The issue of whether petitioner was validly removed as a director of Oralco was decided in favor of the plaintiff, Oralco, in Oralco, Inc., et al. v. Bradley, supra.

Virginia.[15]  In the complaint, as subsequently amended, petitioner alleged, inter alia, breach of contract with respect to the alleged Boyle Agreement, intentional interference with business relationship, fraud, negligent misrepresentation, promissory estoppel, legal malpractice, breach of fiduciary duty, and conversion and corporate waste.  When the standstill and right of first refusal issues were litigated by the parties, the Chancery Court of New Castle, Delaware agreed with Mr. Boyle that there was no enforceable Boyle Agreement.  See Oralco, Inc., et al. v. Bradley, supra.

B.    Bradley (individually and derivatively on behalf of Oralco) v. Boyle, O'Sullivan, Graev & Karabell, and Oralco

On April 21, 1994, petitioner filed a lawsuit in his individual capacity and on behalf of Oralco against Mr. Boyle, OGK, and Oralco as a nominal defendant in the United States District Court for the Northern District of West Virginia.[16]  On May 5, 1994, the District Court denied petitioner's plea for a temporary restraining order and preliminary injunction.  On February 27, 1995, the District Court, following a trial ruled against petitioner and subsequently, on August 8, 1995, denied petitioner's motions to reconsider.

---

[15] This is lawsuit number one of the Six Lawsuits.  See supra note 3.

[16] This is lawsuit number two of the Six Lawsuits.  See supra note 3.

C.    Ormet v. Bradley (Collection Action)

On November 2, 1992, Ormet Corporation filed a lawsuit in the United States District Court for the District of Connecticut against petitioner.[17]  This lawsuit asserted that petitioner owed Ormet $714,411.47 from an unpaid July 25, 1989, note petitioner executed in favor of Ormet in the original amount of $650,000.

D.    Boyle v. Boyle (Boyle Divorce Proceedings and Stock Purchase Option)

During his contest with petitioner for control of Oralco, Mr. Boyle was also involved in divorce proceedings with his then wife, Camilla M. Boyle (Ms. Boyle).  Mr. Boyle and Ms. Boyle were married on February 10, 1962.  During the majority of their marriage, Mr. Boyle was employed as an engineer with Kaiser Aluminum Corporation (Kaiser).  In April 1983, Mr. Boyle left Kaiser to become the president of Ormet, which was losing millions of dollars at the time he assumed the role of president. In September 1986, Mr. Boyle acquired 1,500,000 ORA shares.  At that time, ORA was the parent company of Ormet.  Through an ORA stock redemption, a reorganization of ORA, and a leveraged buyout of Ormet, Mr. Boyle exchanged his 1,500,000 ORA shares for 241,935 Oralco shares.  Following this reorganization, Oralco owned all the shares of ORA, and ORA, in turn, owned all the shares of Ormet.

---

[17] This is lawsuit number three of the Six Lawsuits.  See supra note 3.

On November 5, 1987, Ms. Boyle filed for divorce in the Circuit Court of Ohio County, West Virginia (Circuit Court), seeking equitable distribution of the marital assets. Although the divorce proceedings lasted into 1994, the parties were separated on November 11, 1987. Upon the grant of divorce, by the Circuit Court on December 15, 1992, all the Boyles' marital assets were divided.

Mr. Boyle and Ms. Boyle disputed the number of Oralco shares that should be awarded to Ms. Boyle in satisfaction of her marital rights. During the Boyles' separation, the value of the Oralco shares had increased significantly from $66.55 per share to $275 per share. Although Mr. Boyle acquired 241,935 Oralco shares during his marriage with Ms. Boyle, in its December 15, 1992, order, the Circuit Court awarded Ms. Boyle only 29,273 Oralco shares and Mr. Boyle 212,662 Oralco shares. Since Ms. Boyle believed she was entitled to at least half of Mr. Boyle's Oralco shares, she appealed the divorce decree on February 17, 1993.

On December 17, 1992, after the Boyles' divorce decree was entered, petitioner and Ms. Boyle entered into a confidential option agreement (Option Agreement) granting petitioner the option to purchase from December 17, 1992, through December 31 1996, for cash or certified funds at a price of $117 per share all Oralco shares that Ms. Boyle might acquire from Mr. Boyle

pursuant to a final court order.  In addition, Ms. Boyle also granted petitioner an irrevocable proxy to vote all Oralco shares awarded to her so long as the Option Agreement was in force.

As consideration for the Option Agreement, petitioner was to pay Ms. Boyle $25,000 upon its execution, plus $5,000 per month for the months of January, February, and March 1993, and $10,000 per month thereafter until the later of December 31, 1996, or until the option was exercised or terminated.  In addition, if Ms. Boyle was not awarded sufficient Oralco shares, when combined with petitioner's shares, to control Oralco, petitioner could terminate the Option Agreement.  If the Option Agreement remained in force through December 31, 1996, Ms. Boyle held a put option to petitioner, which she could exercise during the first 30 days of January 1997, if petitioner failed to purchase her shares on or before that date.

During Ms. Boyle's appeal of their divorce order, Mr. Boyle became concerned that a modification of the divorce order could result in a distribution of more Oralco shares to Ms. Boyle.  Mr. Boyle might then lose control of Oralco, triggering the "loss of control provision" in a credit agreement between Ormet and a banking syndicate.[18]  To avoid that eventuality and unknown to petitioner, as of January 19, 1993, Mr. Boyle and Ms. Boyle

---

[18] Mr. Boyle also argued that the loss of control provision would trigger acquisition-financing debt and materially impair the value of the Oralco stock for both Mr. Boyle and Ms. Boyle.

executed a confidential stipulation as to their Oralco marital stock.

The stipulation confirmed the Boyles' agreement as to certain aspects of the distribution of the Oralco shares Mr. Boyle acquired during their marriage.  Included in the stipulation was the Boyles' joint acknowledgment that on January 19, 1993, pursuant to an exchange agreement, Mr. Boyle exchanged his remaining 212,662 Oralco shares for 212,662 shares of Elmwood Acquisition Corporation (EAC II).  EAC II was a newly created shell holding company, wholly owned by Mr. Boyle, and created by him to assist in retaining voting control of Oralco.

The only asset held by EAC II was the 212,662 Oralco shares exchanged by Mr. Boyle.  The Boyles further stipulated that if the December 15, 1992, divorce order were revised on appeal and the marital stock became an issue, then the marital stock would consist of Ms. Boyle's 29,273 Oralco shares and Boyle's 212,662 EAC II shares, rather than Boyle's original 241,935 Oralco shares.

Ms. Boyle's appeal of the divorce decree claimed that she was entitled to 120,967.5 Oralco shares, which she alleged represented one-half of the 241,935 Oralco shares Mr. Boyle acquired during their marriage.  On February 18, 1994, the Supreme Court of Appeals of West Virginia reversed the Circuit

Court divorce order. The Supreme Court held that Ms. Boyle was entitled to 120,967.5 Oralco shares.

The reversal of the divorce order became final on March 21, 1994, and on March 22, 1994, Ms. Boyle's attorney, Jolyon W. McCamic (Mr. McCamic), filed an application with the Circuit Court requesting Oralco to transfer an additional 91,694.5 Oralco shares to Ms. Boyle. Thereafter, on March 24, 1994, petitioner's attorney, Herbert Conner (Mr. Conner), wrote a letter to Mr. Boyle warning him that petitioner would take legal action in the event of any attempt by Mr. Boyle or Oralco to induce a breach of contract with respect to Ms. Boyle and petitioner's Option Agreement. Thereafter, petitioner on March 24, 1994, filed a motion to intervene as a plaintiff in the Boyles' divorce proceedings.

On March 31, 1994, the Circuit Court issued a Findings and Divorce Decree (final divorce decree) in the Boyle's divorce proceeding: (1) Denying Mr. McCamic's application for a transfer of 91,694.5 Oralco's shares to Ms. Boyle, (2) ordering Mr. Boyle to transfer 120,967.5 EAC II shares to Ms. Boyle in satisfaction of her one-half marital rights, (3) ordering Mr. Boyle to cause Oralco to immediately redeem Ms. Boyle's newly acquired EAC II shares for $14,400,000, and (4) ordering Ms. Boyle to transfer the previously awarded 29,273 Oralco shares back to Mr. Boyle.[19]

---

[19] Mr. Boyle was also required to hold Ms. Boyle harmless
(continued...)

On March 31, 1994, Ms. Boyle transferred her 29,273 Oralco shares back to Mr. Boyle.  Mr. Boyle, in turn, transferred 120,967.5 EAC II shares to Ms. Boyle.  Mr. Boyle then caused Oralco to purchase Ms. Boyle's 120,967.5 EAC II shares for $14,400,000.  To finance Oralco's purchase of Ms. Boyle's EAC II shares, Bancboston Financial Company (Bancboston) acting through its employee, David L. Risdon (Mr. Risdon), lent $14,400,000 to Oralco.  These actions prevented petitioner from exercising his stock purchase option with Ms. Boyle because the event triggering the Option Agreement never occurred.

On March 31, 1994, the Circuit Court denied petitioner's motion to intervene in the Boyles' divorce proceeding on the theory that petitioner's interests were adequately protected by existing parties.[20]  This action prompted petitioner to appeal the order to the West Virginia Supreme Court of Appeals.  On June 16, 1995, the Supreme Court of Appeals of West Virginia upheld

---

[19](...continued)
for any and all losses, liabilities, judgments, awards, damages, assessments, charges, fines, penalties, costs, attorney's fees, and expenses paid, suffered or incurred by Ms. Boyle arising out of any claim, demand, action, suit, or proceeding brought by petitioner resulting from Ms. Boyle's actions in compliance with the final divorce decree.

[20] This is lawsuit number four of the Six Lawsuits.  See also supra note 3.

the Circuit Court's order denying petitioner's motion to intervene in the Boyles' divorce proceeding.[21]

E.    Camilla Boyle v. Bradley (Litigation Regarding the Stock Purchase Option)

During 1994 and 1995, while petitioner was attempting to exercise his option to purchase Ms. Boyle's stock in Oralco, Ms. Boyle, through her attorney, Mr. McCamic, filed a lawsuit against petitioner in the Circuit Court of Ohio County, West Virginia alleging that the Option Agreement was induced by fraud.[22]  This action was removed to the United States District Court for the Northern District of West Virginia and assigned to Judge Stamp.

F.    Bradley v. McCamic, Risdon, Bancboston (Third Party Suit)

On May 24, 1994, petitioner, filed a third-party complaint against Ms. Boyle's attorney, Mr. McCamic, Bancboston employee, Mr. Risdon, and Bancboston.[23]  On or about March 8, 1995, Ms. Boyle responded to petitioner's third-party complaint with an affidavit stating that when she executed the Option Agreement, she believed petitioner had the resources to pay for any shares of Oralco she would receive in settlement of her marital claims.

---

[21] This order also affirmed the order issued in lawsuit number four.  See also supra note 3.

[22] This is lawsuit number five of the Six Lawsuits.  See supra note 3.

[23] This is lawsuit number six of the Six Lawsuits.  See supra note 3.

Ms. Boyle contended that until late March 1994, she was not aware of petitioner's allegedly defaulted financial obligations to Costar and Signal totaling $31,086,358.80 and a $650,000 payment due to Oralco.[24]

III. Statements by Mr. Boyle or Ormet

Mr. Boyle or Ormet released several documents to the public between April 15 and May 11, 1994. The April 28, 1994, document was a letter to Ormet employees signed by Mr. Boyle. Four documents were press releases. Another document was an article in the May 11, 1994, edition of the company's "Ormet News". Petitioner cited statements in the documents as the basis for his personal injury claims.

For example, Mr. Boyle or Ormet made the following pronouncements: (1) "This ad is another of the many attempts by Charles Bradley, a minority shareholder in Oralco, to extract money from Oralco for his personal benefit."; (2) "Mr. Bradley has a long history of driving companies * * * into the ground, resulting in jobs being lost forever while maintaining some degree of personal wealth."; and (3) "Bradley is a self-styled

---

[24] Petitioner's financial obligations under these notes resulted from the decisions in the Signal and Costar litigations and the settlement and compromise of lawsuit number three of the Six Lawsuits. See supra note 3. Judge Stamp dismissed lawsuit number three on Aug. 10, 1995. See also infra note 33.

deal maker who cares little for the damage created and people's lives destroyed when his deals fall apart."[25]

Petitioner's law firm, Finn Dixon & Herling LLP, reviewed the basis of petitioner's claims for libel, slander, and intentional infliction of emotional distress. In a memorandum to petitioner dated November 12, 1997, the firm stated that neither Mr. Boyle nor Ormet had a valid truth defense to petitioner's claim for defamation.

IV. Lawsuit Pleadings

Despite dozens of pages of pleadings, there was no reference in any of these cases to any personal injuries suffered by petitioner. Although petitioners amended their complaints several times and the parties filed counterclaims and derivative claims, none of these documents contained any claims for personal injuries. The Court notes the parties stipulated: "Petitioner did not file any lawsuits against Oralco, Ormet Corporation and/or Boyle concerning any personal injuries that he incurred as a result of any actions undertaken and/or statements made or published by Oralco, Ormet Corporation and/or Boyle concerning petitioner." This stipulation is consistent with the credible

---

[25] Petitioners attached to their opening brief page two of "Ormet News", an internal company newsletter, seeking to use statements contained therein as evidence. However, joint stipulated Exhibit 169-J, as stipulated by the parties and filed with the Court, did not include page two of "Ormet News", and petitioners did not separately offer page two into evidence. Thus, the Court will disregard page two. Petitioners are not allowed to add documents into evidence by attaching them to their brief.

testimony of Mr. Bachman, Oralco's and Mr. Boyle's attorney, who stated: "I don't remember spending any time ever evaluating or defending against a claim of libel or slander." Petitioner and his attorney, Mr. Conner, testified that they had intended to amend their pleadings at some point to allege personal injury in the form of libel and slander but were deterred from doing so by the court, which informally requested that no additional claims be filed until the pending claims could be resolved. As a result, Mr. Conner first informed Mr. Boyle and Ormet of Mr. Boyle's personal injury claims in a letter dated July 27, 1995, to Cathy M. Armstrong, counsel for Ormet.

## V.    Settlement of the Six Lawsuits

Settlement efforts to resolve the Six Lawsuits began in the fall of 1994, but they did not become serious until the summer of 1995. In order to raise funds to settle the lawsuit between petitioner and Signal, petitioner's counsel discussed Ormet's possible redemption of petitioner's Ormet shares,[26] as well as, the Ormet shares under petitioner's voting control as trustee of the voting trust.

To determine the value of petitioner's Ormet stock, both petitioner and Mr. Boyle conducted valuations of Ormet to facilitate Ormet's possible stock redemption. Petitioner received a draft valuation of Ormet, dated December 5, 1994, from

---

[26] By this date, Oralco had changed its name to Ormet.

C. David Allen, Jr., of Price Waterhouse LLP approximating the valuation of Ormet in the range of $700 million to $800 million.[27]  By letter dated March 1, 1995, to Mr. Conner, Donald J. Pfingstler of Barrington Consulting Group, Inc., addressed the value of Ormet and the value of petitioner's shares in Ormet held individually and as trustee under the voting trust agreements.

Mr. Pfingstler concluded that had petitioner acquired sufficient Ormet shares to control Ormet, the valuation of his shares would have been $376 million to $588 million; otherwise, as turned out to be the case, the valuation of petitioner's shares would be approximately $110 million to $165 million because they reflected a minority discount.  In a June 27, 1995, letter to Charles E. Bachman (Mr. Bachman), attorney for Ormet, Mr. Conner indicated that petitioner would sell his shares and the shares of his voting trust back to Ormet "for cash[,] and [it] would involve the settlement and discontinuation of all litigation [the Six Lawsuits], at the buyer's request, or Bradley's cooperation in the continued pursuit of the litigation, again, at the buyers [sic] option (and with his financing of the costs of litigation)."  This offer was subject to further negotiations.

---

[27] Mr. Conner testified that petitioner was not able to effectively use the Price Waterhouse LLP valuation in determining the value of Ormet because Price Waterhouse LLP withdrew its draft valuation, claiming that it was unauthorized.

The parties exchanged several drafts of various settlement agreements before they reached a final agreement. After negotiated changes, Ormet and Mr. Boyle both believed as did Mr. Bradley that there was a binding settlement of all relevant issues when the Settlement Term Sheet was executed. Mr. Bradley states in his opening brief: "Parties to a term sheet agree to the conditions set forth in the term sheet and to that extent it is considered binding with respect to those particular items."

The Settlement Term Sheet, dated August 7, 1995, was signed by the parties. Petitioner (based on the Stanwich fax machine date on the base of the document and the date of Mr. Bachman's cover sheet correspondence) appears to have signed the Settlement Term Sheet on August 8, 1995, Boyle and Ormet on August 8 or 9, and Signal on or after August 8, 1995, probably August 11, 1995.

Of particular note was the demand by Mr. Boyle and Oralco that the settlement result in a complete resolution and release of any and all claims known or unknown at the time of settlement. Mr. Bachman credibly testified regarding the August 7, 1995, Settlement Term Sheet and whether he remembered any controversy over the release between himself and Mr. Conner. He stated: "No, I remember that if there was going to be a settlement here, it would be a settlement. I mean, as I said, real, imagined, current, historical, future, and as broad as you can define the release." It is not surprising or unusual that broad general

mutual releases were required by paragraph 6c of the Settlement Term Sheet, as many settlements of this kind include similar provisions as standard practice. Mr. Bradley's attorney, Mr. Conner, testified that the issue of a general release was not resolved until the subsequent Implementing Agreement was executed.

In a memorandum dated June 30, 1995, to Mike Dougherty (Mr. Dougherty), a tax attorney, Scott Junkin (Mr. Junkin), counsel for petitioner, expressed petitioner's desire to structure the Oralco/Ormet payout such that a portion would be nontaxable. In his memorandum, Mr. Junkin informed Mr. Dougherty:

> CEB wants to know if there is any way to structure the settlement so that a portion of the ORALCO payments are non-taxable. He mentioned allocating a portion of the settlement to the share repurchase and a portion to dropping his claims under the law suit. I expressed skepticism about whether any portion could be non-taxable, but I will defer to you on that. CEB may be thinking of some analogy to the non-taxability of settlement payments for pain and suffering in a negligence suit.

On the same day petitioner signed the Settlement Term Sheet, through correspondence with his attorney, he sought to confirm his desire that a portion of the Ormet settlement would be treated as nontaxable for Federal income tax purposes. Petitioner expressed his expectations in a letter to Mr. Dougherty dated August 8, 1995, that $12 million would be received "for settlement of litigation on a personal injury basis". By letter dated August 14, 1995, petitioner asked his

attorney, Mr. Conner, to review Mr. Dougherty's memorandum of August 11, 1995, and assemble all the documents showing damage to his reputation.

Petitioner also contacted his attorney, Brett Dixon (Mr. Dixon), to review the tax issues related to the settlement.  By memorandum dated August 15, 1995, Mr. Dixon stressed the importance of inserting language into the Implementing Agreement which would reflect that the $12 million payment was for petitioner's actual personal and/or physical injury.  He wrote:

> In light of the punitive-versus-actual damages issue we discussed with respect to the $12 million payment in settlement of the litigation, I think it is important to try to get language into the Implementing Agreement to the effect that the payment is being made in respect of actual personal injury (defamation, libel, slander, emotional distress) that you suffered as a result of this matter.  It would also be helpful if you could document any physical injury or illness you suffered (severe emotional distress requiring treatment, etc); this would provide an alternative basis for exclusion (i.e., even if the personal injury damages are punitive, they relate to a physical condition). [Emphasis added.]

Mr. Dixon further suggested that petitioner include "in the Implementing Agreement a covenant that the partics [sic] will respect the allocation between the different elements of recovery for all tax purposes."  As late as August 16, 1995, Mr. Dixon was still finalizing the language he believed would be ideal for petitioner to include in the Implementing Agreement.  In his memorandum to petitioner of that date, Mr. Dixon suggested the following language be included in any final agreement:

Ormet and Bradley acknowledge and agree that the Bradley Litigation Settlement Price is being paid in respect of actual personal injury (including, without limitation, damage to personal reputation and mental and emotional distress) suffered by Bradley as a result of the Litigations and other actions taken by and disputes with the Defendants.

Mr. Dixon also opined in a memorandum that Ormet should not care about how petitioners characterize the settlement payment for tax purposes since it would be deductible by Ormet in any event. Contrary to Mr. Dixon's advice, because of objections by Mr. Boyle and Ormet, neither his suggested language, nor anything similar, was contained in the Implementing Agreement. Mr. Dixon, due to the litigants' animosity, anticipated this possibility noting in the same memorandum that Ormet may be unwilling to include the language in a final agreement. Alternatively, he suggested that the agreement language be "watered down". He also expressed his hope that: "At a minimum, Ormet should be willing to permit inclusion of a statement that you represent that you have suffered such injuries."

In reference to the $12 million payment, the Settlement Term Sheet stated that "Ormet shall pay $12,000,000 to Bradley in settlement of his direct claims against Ormet." The Implementing Agreement incorporated the terms of the Settlement Term Sheet utilizing the following more expansive language:

      3. <u>Litigation Settlement; Expense Reimbursement;
Releases; Termination of Voting Trust Agreement</u>.

      (a) * * * Ormet will pay to Bradley, by wire transfer of immediately available funds to an account specified to Ormet in writing, (i) $12 million (the "<u>Bradley Litigation Settlement Price</u>") in settlement of all direct claims ("Direct Claims") by Bradley against Ormet, whether relating to the Litigations or otherwise, including but not limited to those libel and slander claims described in that certain letter from Herbert Bennett Conner to Charles E. Bachman dated August 11, 1995, and (ii) $4 million as reimbursement of legal fees and expenses related to the Litigations (the "<u>Litigation Reimbursement</u>").[28]

      (b) Each Member hereby acknowledges that any claims against the Defendants or the Other Litigations Parties other than the Direct Claims have no value, and that no payment is being made to any Member in settlement of, or otherwise with respect to, such claims.

Mr. Conner testified that the Settlement Term Sheet providing for the $12 million payment related only to the settling of petitioner's filed direct claims against Ormet, not to any libel or slander suits. Further, Mr. Dixon stated that there were no documents regarding petitioner's physical injuries available when Mr. Dixon gave a tax opinion regarding the settlement. Mr. Bachman testified that he did not spend any time defending Oralco against any personal injury claims because petitioner never filed any claims against it. Mr. Boyle, Mr.

---

[28] The Aug. 11, 1995, letter written by Mr. Conner and referred to in Mr. Bachman's testimony was attached to petitioners' opening brief, but petitioners never offered it into evidence. Petitioners are not permitted to supplement the evidence to include this letter by merely attaching it as an exhibit to their brief. Accordingly, the Court will disregard this document. See also <u>supra</u> note 25.

Bachman, and Oralco refused to designate any portion of the $12 million settlement specifically for any unfiled alleged personal injury claims of libel and slander. Instead, even the Implementing Agreement designated the $12 million as payment for all direct claims including any libel and slander. This general language does not allocate any amount to personal injury claims.

Pursuant to the settlement, payments were made on August 18, 1995, to Mr. Poole $13,229,808, Mr. Siebert $4,410,060, Mr. Hall $1,200,072, and Precision $1,274,100 in exchange for their shares of stock in Ormet. Petitioner personally received $9,485,960 plus the $27 million paid to Signal and the $3,400,000 paid to Costar for a grand total of $39,885,960 in exchange for his Ormet shares plus $12 million for his direct claims.

Petitioners also received $4 million as a reimbursement for petitioner's legal fees and expenses related to the Six Lawsuits. Petitioners had deducted or would have deducted these reimbursed legal fees and expenses as business expenses on their 1995 Schedule C, Profit or Loss From Business. The parties have stipulated that "None of the aforesaid legal fees or expenses were allocated to any of petitioner's claims against Oralco, Ormet Corporation and/or Boyle for libel, slander and/or defamation." Nevertheless, petitioners excluded the $12 million Ormet payment from their gross income on their 1995 return on the basis of section 104(a)(2).

- 28 -

OPINION

I.   Contentions of the Parties

Petitioners contend that there were two separate transactions that occurred when the parties resolved their disputes--a sale of stock for $60 million shared in by all stockholder parties of the Voting Trust and the $12 million payment from Ormet to Mr. Bradley.  The later payment, it is argued, was paid only to Mr. Bradley because it was in settlement of only his claims for what he maintains was a conspiracy of defamation, slander, and libel to his business reputation, as well as intentional infliction of emotional distress.

Petitioners argue that had any part of the $12 million been paid for stock, it would have had to be shared with the other parties to the Voting Trust.  Because it was not shared, the only possible explanation is Mr. Bradley's personal injuries, payment for which would be excludable from gross income under section 104(a)(2).  As a part of the settlement, a general release was required which would include Mr. Bradley's tort-type personal injury claims.[29]

---

[29] Petitioner underwent surgery in August 1993 for prostate cancer.  Although on brief petitioners claimed that the increased stress resulting from petitioner's involvement in the Six Lawsuits adversely affected his ability to fight the cancer, there is no evidence to suggest that events resulting from the Six Lawsuits were the indirect, let alone, the proximate cause of petitioner's metastasized cancer.  "[T]he consequences of a dispute are not necessarily commensurate with its origin."  Glynn v. Commissioner, 76 T.C. 116, 121 (1981) (citing Knuckles v.

(continued...)

Petitioners contend that they have, by implication, established the $12 million was paid on account of Mr. Bradley's personal injury claims by virtue of negative inference. In addition, they assert their right to arrange and conduct their affairs to minimize adverse tax implications. See Commissioner v. Newman, 159 F.2d 848, 850-851 (2d Cir. 1947) (Hand, J., dissenting). They point to the Implementation Agreement, the final settlement document, which they contend supersedes all others and implements their tax planning. They note it provides the $12 million will be paid to Mr. Bradley "in settlement of all direct claims * * * by Bradley against Ormet, whether relating to the Litigations [the Six Lawsuits] or otherwise, including but not limited to those libel and slander claims described in that certain letter from Herbert Bennett Conner to Charles E. Bachman dated August 11, 1995."

Respondent counters by arguing the disputes were settled by the binding Settlement Term Sheet, which reflects the actual basis of the settlement, and the Implementing Agreement does not negate the Settlement Term Sheet. Further, respondent contends that the Six Lawsuits did in fact involve direct claims by Mr. Bradley against both Ormet and Mr. Boyle and that these direct

---

[29](...continued)
Commissioner, 349 F.2d 610 (10th Cir. 1965), affg. T.C. Memo. 1964-33), affd. 676 F.2d 682 (1st Cir. 1982). Thus, we do not discuss whether the settlement payment was paid on account of physical sickness.

claims were contract damage claims not personal injury tort claims.

Respondent characterizes petitioners' arguments as self-serving attempts to structure the settlement to minimize their tax exposure. Respondent contends that petitioners did not provide any evidence that the payment was actually in settlement of Mr. Bradley's alleged personal injuries. Instead, the $12 million may have been, in whole or in part: A payment for contract claims; additional disguised stock purchase price; and/or commission to Mr. Bradley for services to all stockholder parties of the Voting Trust for maintaining the various actions and negotiating the resolution of these matters; and to end the then-ongoing significant litigation costs foisted upon the parties by dint of petitioners' litigation.

## II. Burden of Proof

Where the Commissioner has determined a deficiency in tax, the taxpayer bears the burden of proving facts that show the determination is incorrect. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933); Feldman v. Commissioner, 20 F.3d 1128, 1132 (11th Cir. 1994), affg. T.C. Memo. 1993-17. However, the burden of proof may shift to respondent under section 7491(a). Section 7491 applies to examinations commenced after July 22, 1998. Information document requests in the record indicate respondent's examination commenced on or before August 1997.

Therefore, section 7491 does not apply, and the burden of proof remains with petitioners.

III. Determinations of Gross Income

The definition of gross income under section 61(a) broadly encompasses any accession to a taxpayer's wealth. The scope of gross income is sweeping. United States v. Burke, 504 U.S. 229, 233 (1992); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429 (1955). Exclusions from gross income are narrowly construed. Commissioner v. Schleier, 515 U.S. 323, 328 (1995); United States v. Burke, supra at 248 (Souter, J., concurring in judgment); Taggi v. United States, 35 F.3d 93, 95 (2d Cir. 1994). Therefore, settlement proceeds constitute gross income unless the taxpayer proves they are specifically excepted by another statutory provision.

Section 104(a)(2) provides for an exclusion from gross income:

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) In General.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--

* * * * * * *

(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness * * *

Neither the statute nor the legislative history of section 104(a)(2) offers any explanation of the term "personal injuries". United States v. Burke, supra at 234; Threlkeld v. Commissioner, 87 T.C. 1294, 1305 (1986), affd. 848 F.2d 81 (6th Cir. 1988). The regulations under section 104(a)(2) have formally linked the identification of "personal injury" to traditional tort principles since 1960. United States v. Burke, supra at 234.

Section 1.104-1(c), Income Tax Regs., establishes the requirements of section 104(a)(2) and provides:

> (c) Damages received on account of personal injuries or sickness.--Section 104(a)(2) excludes from gross income the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness. The term "damages received (whether by suit or agreement)" means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution.

The plain language of section 104(a)(2) and the text of the regulations establish two independent requirements that must be fulfilled for any recovery to be excluded from gross income. The taxpayer must demonstrate: (1) The underlying cause of action giving rise to the recovery was "based upon tort or tort type rights", and (2) the settlement was entered into "on account of personal injuries or sickness". See United States v. Burke, supra at 234-235.

IV.  Characterizing "personal injuries"

What constitutes "personal injuries" and whether damages were received because of them is a question of fact.  Threlkeld v. Commissioner, supra at 1305.  It is established that "personal injuries" encompasses both physical and nonphysical injuries.[30] United States v. Burke, supra at 237 n.6 (quoting Rickel v. Commissioner, 900 F.2d 655, 658 (3d Cir. 1990), affg. in part and revg. in part 92 T.C. 510 (1989)); Threlkeld v. Commissioner, supra.

In Seay v. Commissioner, 58 T.C. 32, 37 (1972), this Court held that damages received for mental strain, personal embarrassment, and injury to personal reputation may be excluded under section 104(a)(2).  Specifically, personal injuries include emotional distress, see Burke v. United States, supra at 235 n.6, mental pain and suffering, see Bent v. Commissioner, 835 F.2d 67, 70 (3d Cir. 1987), affg. 87 T.C. 236 (1986), and injury to

---

[30] Sec. 104(a)(2) was amended in 1996 by the Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605(a), 110 Stat. 1838, effective generally for amounts received after Aug. 20, 1996.  In relevant part, the amendment added the modifier "physical" after "personal" and before "injuries".  This amendment was made to clarify that amounts received on account of personal injuries must be received for physical injuries and not exclusively for emotional distress.  However, amended sec. 104(a)(2) does allow an exclusion for the amount of damages in excess of the amount paid for medical care attributable to emotional distress.  Because the $12 million at issue here was received before Aug. 20, 1996, sec. 104(a)(2) as it existed during 1995 is the law applicable to this case.

personal and professional reputation, see <u>Threlkeld v. Commissioner</u>, 848 F.2d 81, 83-84 (6th Cir. 1988).

There is no distinction between damage to one's personal reputation and one's business reputation. <u>Threlkeld v. Commissioner</u>, 87 T.C. at 1305. Thus, had Mr. Bradley's claim for defamation, libel, intentional infliction of emotional distress, and damage to his reputation been made, it would be a claim for nonphysical personal injuries and would generally fall within the ambit of personal injuries for purposes of section 104(a)(2).

V.   <u>Rationale of Settlement</u>

Determining whether a settlement was entered into on account of sickness or personal injuries requires an examination of the settlement agreement language. <u>Pipitone v. United States</u>, 180 F.3d 859, 863 (7th Cir. 1999). In support of petitioners' contention that the $12 million was paid on account of tort-type personal injuries, several cases are cited. Reliance on them is misplaced, however, since these cases only point out the nature of the tort injury, without reference to the motivation behind each settlement payment. It is not sufficient that a tort or tort-type injury exists. See <u>United States v. Burke</u>, <u>supra</u> at 234-235; see also <u>Threlkeld v. Commissioner</u>, 87 T.C. at 1305. To be exempt, the damages received <u>must be in settlement of those injuries</u>. Sec. 1.104-1(c), Income Tax Regs; see also <u>Commissioner v. Schleier</u>, 515 U.S. at 337.

Here, the Settlement Term Sheet contained a very general reference to petitioner's claims against Ormet:[31]  "in settlement of [Mr. Bradley's] direct claims against Ormet".  It failed to make even a general, much less a definitive allocation between tort or tort-like claims excludable under section 104(a)(2) and other claims not excludable under section 104(a)(2).  Even the "Johnny-come-lately" paragraph 3 of the Implementing Agreement gave only very general indications as to the alleged specific tort claims.  It said:  "including but not limited to those libel and slander claims described in * * * the letter dated August 11, 1995".

A.   Express Language

Language in a settlement agreement can offer probative evidence on how a settlement payment should be treated for purposes of section 104(a)(2).  See, e.g., Bent v. Commissioner, 87 T.C. 236, 246 (1986), affd. 835 F.2d 67 (3d Cir. 1987).  Petitioners did not provide credible evidence of an agreed-upon amount attributable to personal injuries between petitioner and Ormet or their respective counsel in either the Settlement Term Sheet or the Implementing Agreement.

Petitioner's law firm, Finn Dixon & Herling LLP, had made petitioners aware that the absence of documentation supporting

---

[31] See supra note 5 discussing the change of the company's name from Oralco to Ormet.

payment of an agreed amount for personal injury would be problematic.  In a memorandum to petitioner, the firm wrote:

> Where a settlement payment is only partially in payment for tortious injury, the burden of proof is on the recipient to show the amount paid for the tort. Frank, 22 T.C. 945 (1954), [affd. 226 F.2d 600 (6th Cir. 1955)].  Allocations in a settlement agreement are respected if they are reasonable.  In Seay, 58 T.C. 32 (1972), acq. 1972-2 CB 3, the taxpayer received payment for breach of contract and for personal injuries from embarrassing publicity.  A letter confirming the apportionment of funds attributable to personal injury signed by negotiators on both sides was held to have established the amount that was attributable to personal injury.  [Emphasis added.]

The record is devoid of any evidence helpful to petitioners of the type suggested by petitioner's counsel.

Mr. Dougherty noted that one of petitioner's problems would be "sustaining the bona fides of the allocation if challenged. Allocations to personal injury recoveries will be respected if made in an adversarial context, at arm's length, and in good faith."  Mr. Dougherty cited Knuckles v. Commissioner, 349 F.2d 610 (10th Cir. 1965), affg. T.C. Memo. 1964-33, as an example where exclusion from gross income was denied when counsel "pressed for an allocation to personal injuries late in the settlement negotiations to get a better tax result".

Both the Settlement Term Sheet and the Implementing Agreement provide for a "global release" of petitioner's claims against Ormet.  Yet, none of the settlement documents earmarked a specific amount exclusively for petitioner's personal injuries

including libel or slander.  The Court finds, as a factual matter, that the Settlement Term Sheet speaks for itself and that any dispute about the mutual releases was merely quibbling.

A court may not be in a position to apportion damages among various contract and tort claims where it appears that the settlement was all-encompassing.  Taggi v. United States, supra at 96.[32]  It is petitioner's duty in this case to prove the proper allocation between taxable and nontaxable amounts.  Pipitone v. United States, supra at 865.  "'[F]ailure to show the specific amount of the payment allocable to the claims of tort or tortlike damages for personal injuries results in the entire amount's being presumed not to be excludible.'"  Id. at 864 (quoting Wise v. Commissioner, T.C. Memo. 1998-4); see Pipitone v. United States, supra at 864; Taylor v. Commissioner, T.C. Memo. 1999-323, affd. 246 F.3d 676 (9th Cir. 2000); Morabito v. Commissioner, T.C. Memo. 1997-315.

State law does not assist petitioner.  None of petitioner's State claims as presented in his State court pleadings pertained to any tort or tort-type injuries.  Instead, the pleadings referenced petitioner's contest for control of Ormet and other related contractual claims.

---

[32] Because this case would normally be appealable to the Court of Appeals for the Second Circuit, absent stipulation to the contrary, Taggi v. United States, 35 F.3d 93, 95 (2d Cir. 1994), is controlling here under this Court's Golsen rule.  See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. on another ground 445 F.2d 985 (10th Cir. 1971).

State law is of little help where there are several claims, only some of which are for personal injuries. The State law classification of the various claims will be of no assistance identifying the claim or claims or in carving up the damage recovery. In such cases we must look to various factors, including the allegations in the State court pleadings, the evidence adduced at trial, a written settlement agreement, and the intent of the payer.* * * [Threlkeld v. Commissioner, 87 T.C. at 1306-1307.]

B. Bona Fide Dispute

Section 1.104-1(c), Income Tax Regs., defines damages for purposes of the exclusion under section 104(a)(2) as amounts which are received from prosecution of a legal suit, or "through a settlement agreement entered into in lieu of such prosecution". In this context, "'[a] settlement is an agreement to terminate or forestall all or part of a lawsuit'". Taggi v. United States, supra at 96 (quoting Gorman v. Holte, 211 Cal. Rptr. 34, 37 (Ct. App. 1985)); see also McCleary v. Armstrong World Indus., Inc., 913 F.2d 257, 259 (5th Cir. 1990).

Settlement must involve a bona fide dispute over excludable damages. Taggi v. United States, supra at 96. The requirement of a bona fide dispute precludes "a contrived 'settlement' designed to avoid taxation of the [settlement] proceeds." Id. The record shows that the first time Mr. Boyle or Ormet was aware petitioner was asserting personal injury claims was following receipt of the letter to Mr. Boyle's counsel of July 27, 1995. Petitioner's assertion of the issue of personal injuries just prior to the drafting of the Settlement Term Sheet is not

determinative. The fact that personal injuries were not mentioned in the Settlement Term Sheet supports the conclusion that the personal injuries, or at least their dollar amount, were contrived.

Mr. Dixon testified that he was not involved in the settlement, nor was he aware that, as a result of the execution of the Settlement Term Sheet, the parties had agreed to release the Six Lawsuits prior to petitioner's receipt of Mr. Dixon's August 15, 1995, letter.[33] Mr. Conner testified that the litigation among the parties pertained only to the filed suits and not to any libel or slander suits.

After execution of the Settlement Term Sheet, petitioner sought advice regarding treatment of part of the settlement proceeds as nontaxable. Mr. Dixon first advised petitioner after execution of the Settlement Term Sheet. These facts are indicative that petitioner, Ormet, and Mr. Boyle were not previously involved in serious discussions or negotiations contemplating a payment for personal injuries. Petitioner's attempted allocation of $12 million in the Implementing Agreement

---

[33] Judge Stamp of the United States District Court for the Northern District of West Virginia dismissed lawsuits number one, two, and three of the Six Lawsuits on Aug. 10, 1995, and lawsuits number five and six of the Six Lawsuits on Aug. 11, 1995. Lawsuit number four was resolved when Judge Stamp granted petitioner's petition for relief from rules 23(e) and 23.1 of the Federal Rules of Civil Procedure with respect to formal notice and court approval of the global settlement of the parties on Aug. 18, 1995.

was contrived.  See <u>Robinson v. Commissioner</u>, 102 T.C. 116 (1994), affd. on this issue and revd. in part. 70 F.3d 34 (5th Cir. 1995); <u>Burditt II v. Commissioner</u>, T.C. Memo. 1999-117.

C.   <u>Intent of the Payor</u>

In the absence of any express language in the agreement, the intent of the payor is the most important factor in determining the purpose of the payment.  <u>Pipitone v. United States</u>, 180 F.3d at 864; <u>Kurowski v. Commissioner</u>, 917 F.2d 1033, 1036 (7th Cir. 1990), affg. T.C. Memo. 1989-149; <u>Knuckles v. Commissioner</u>, 349 F.2d 610, 613 (10th Cir. 1965); <u>Agar v. Commissioner</u>, 290 F.2d 283, 284 (2d Cir. 1961), affg. T.C. Memo. 1960-21; <u>Metzger v. Commissioner</u>, 88 T.C. 834, 847-848 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); <u>Kroposki v. Commissioner</u>, T.C. Memo. 1997-563.

Petitioner and Ormet negotiated the terms of the Settlement Term Sheet for several months before agreeing to a final version. Paragraph 10 of the Settlement Term Sheet finalized their mutual assent stating:  "This Term Sheet is intended to constitute a binding agreement among the parties thereto, subject only to the negotiation and execution of satisfactory documentation." Although the binding nature of the settlement terms was explicitly stated in the Settlement Term Sheet, whether the

Settlement Term Sheet is binding or not,[34] absent a definitive

and adverse party allocation in the settlement document, the

payor's intent behind the settlement governs the allocation of

the damage payments.[35]  More importantly, at the time Ormet and

Mr. Boyle initially agreed to the settlement terms, they were

intending their $12 million payment to be for contract claims in

the six filed cases not tort-like personal injury claims by Mr.

Bradley, the possible existence of which had only been recently

raised.  Thus, it is apparent the $12 million payment was only

---

[34]

"[W]hether [an] enforceable contract arises from
preliminary negotiations and letter of intent or must
await formal agreement depends on the intent of the
parties."  "In ascertaining the intent of the parties
to a contract, it is their outward and objective
manifestations of assent, as opposed to their
undisclosed and subjective intentions, that matter." *
* * This is true "[g]iven the highly detailed nature of
the [letter of intent], the important commercial
circumstances in which it was negotiated, and the fact
that the [letter of intent] appears in all respects to
be a binding contract as to certain promises."
[Gillenardo v. Connor Broad. Del. Co., No. C.A. 98C-06-
015 WLW, 2002 WL 991110, at *6 (Del. Super. Apr. 30,
2002); fn. refs. omitted.]

[35] A settlement may be intended to cover claims not yet
added to an existing lawsuit.  See Eisler v. Commissioner, 59
T.C. 634 (1973), acq. 1973-2 C.B. 1.  However, the facts in
Eisler are distinguishable from those in the instant case.  In
Eisler, both the payor and the payee had a mutual understanding
as to the reason for the settlement payment and the intent of the
release instrument.  In the instant case, the payor did not
intend for the payment to be made for personal injuries at the
time the Settlement Term Sheet was agreed to.  There has been no
factual showing that either Mr. Boyle or Ormet intended any of
the payments, at the time of the signing of the Settlement Term
Sheet, to be for personal injuries.

intended to pay for petitioner's direct claims and was not necessarily intended to include claims of libel, slander, and emotional distress as later alluded to in the Implementing Agreement.

Moreover, it is the absence of knowledge of the claim by Mr. Boyle and Ormet that is most damaging to petitioner. The basis of the controversies between petitioner and Ormet centered around issues dealing with directors' rights in a contest for corporate control and petitioner's rights pursuant to the Option Agreement. These claims are essentially contractual in nature. The record reflects that these disputes were petitioner's and Ormet's primary concern in conducting and settling the Six Lawsuits.

Petitioner's attorney, Mr. Conner, wanted Ormet's attorney, Mr. Bachman, to allocate the $12 million to the personal injury claims that petitioner had not filed, but Mr. Bachman, Mr. Boyle, and Ormet were unwilling to do so. In fact, Mr. Bachman testified that Ormet did not spend any time defending against claims for libel or slander because there were none filed by petitioner.

## VI. Conclusion

Petitioners have not demonstrated that the $12 million payment Mr. Bradley received from Ormet was "on account of personal injuries or sickness". Moreover, the Court will not speculate as to unstated possible reasons for the settlement nor

conjure an amount to settle alleged tort-like personal injury claims.  Absent proof of a specific payment for tort-like personal injuries or evidence that Ormet intended its $12 million payment for Mr. Bradley's personal injuries as part of a bona fide dispute settlement, petitioners do not meet the criteria for exclusion of the $12 million from income under section 104(a)(2). Thus, in accordance with section 61, the $12 million payment must be included in petitioners' gross income for the 1995 taxable year.

To reflect the foregoing and concessions made by the parties,

Decision will be entered under Rule 155.